UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ENTERGY NUCLEAR FITZPATRICK,
LLC, ENTERGY NUCLEAR POWER
MARKETING, LLC, and ENTERGY
NUCLEAR OPERATIONS, INC.,

                Plaintiffs,

            -against-

AUDREY ZIBELMAN, in her official
capacity as Chair of the New York Public
Service Commission, and PATRICIA L.
ACAMPORA, GREGG C. SAYRE, and
DIANE X. BURMAN, in their official
capacities as Commissioners of the New York
Public Service Commission,

               Defendants.

Docket No. _5:15-CV-23_0 [DNH/TWD]

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Nature of Action**

1.    This case arises from unlawful interference by the New York Public Service Commission ("NYPSC") with the exclusive authority of the Federal Energy Regulatory Commission ("FERC") over "the sale of electric energy at wholesale in interstate commerce" pursuant to the Federal Power Act ("FPA"), 16 U.S.C. § 824(b)(1). FERC exercised this authority to approve an auction-based market for the New York region, and the forces of competition in that market led the owner of the Dunkirk generator in western New York to announce that it would "mothball" the generator because its costs were too high to justify continued operation. But NYPSC issued an Order on June 13, 2014 that will keep the uneconomic Dunkirk generator in the market for a decade (through 2025), propped up by

subsidies from a local utility and from a state agency. This interference with FERC-approved market processes, by keeping uneconomic supply in the market, will artificially suppress prices. In the short term, other generators will be harmed because lower prices mean lower revenues. And in the long term, after some of those generators exit the market and new generators have been deterred by lower prices from entering the market, supply will be *reduced* and prices will increase for local utilities, and ultimately for the homeowners and businesses that they serve. Such unilateral interference by NYPSC with the federal market is preempted by the FPA and is also unconstitutional under the dormant Commerce Clause of the United States Constitution.

2.    More specifically, one market within the federally regulated field is the market for "capacity," in which wholesale sellers (generators) commit to deliver energy in the future if called upon and, in exchange, receive payments from wholesale buyers (typically, local utilities that purchase energy and resell it to homeowners and businesses). FERC has approved an auction-based market to ensure that adequate capacity is available to meet New York's needs and that such capacity is supplied by the lowest-cost generators. In the auction, generators, most located within New York but some located outside New York, offer a price per unit of capacity that over time will yield sufficient market revenues to cover their costs. Because lower-cost generators will submit lower offers than higher-cost generators, the lower-cost generators' offers will be accepted and the higher-cost generators' offers will not. Over time, this process will result in low-cost generators staying in operation, high-cost generators shutting down, and new generators coming online when market prices support investment in new generation.

3.    One such higher-cost generator is the Dunkirk generator. In March 2012, the Dunkirk generator's owner, NRG Energy, Inc., announced that "it intended to 'mothball' the

2

Dunkirk facility due to presently unfavorable economic conditions."[1]  And through most of 2013, National Grid, a local utility that purchases energy and capacity on the interstate wholesale market and resells it to homeowners and businesses in western New York,[2] similarly resisted the idea of keeping the uneconomic Dunkirk plant in operation.  National Grid further explained that any potential short-term "reliability" concerns raised by Dunkirk's retirement were best addressed by upgrading the transmission system rather than by keeping Dunkirk in operation.

4.    On December 15, 2013, however, New York Governor Andrew M. Cuomo announced that Dunkirk and National Grid had reached an agreement to keep Dunkirk in the market, "repowered" as a natural gas-fired (rather than coal-fired) plant.  NYPSC then issued an Order that reviewed and approved a Term Sheet setting forth the agreement.

5.    As noted, market forces had not furnished sufficient incentive for Dunkirk to remain in operation, whether as a natural gas-fired or coal-fired plant.  The Term Sheet bridges this gap by providing that, in exchange for Dunkirk's commitment to participate in the region's wholesale energy and capacity markets through 2025, Dunkirk will receive out-of-market payments of $20.4 million per year from National Grid and a $15 million one-time subsidy from a New York State agency.  The contract structure will lead Dunkirk to bid below its actual costs in the capacity auction, and will cause the auction market to "clear" at a lower price than otherwise would have resulted.  Because all generators whose offers are accepted in the auction are paid that same clearing price, all of these generators will receive lower capacity revenues than they otherwise would have received.  According to a study commissioned by National Grid,

---

[1]  Order Addressing Repowering Issues And Cost Allocation And Recovery, Case No. 12-E-0577, at 3 n.2 (NYPSC June 13, 2014) ("Order").  The Order is attached to this Complaint as Exhibit A.

[2]  Despite its broad-sounding name, National Grid operates for purposes of this action as a local retail utility that purchases energy (and capacity) on the interstate wholesale markets and resells it to homeowners and businesses in western New York.

these other generators will receive approximately $841 million less than they would have received through the ordinary functioning of the market.

6.     In other words, as a result of NYPSC's Order, Dunkirk, an uneconomic generator with 435 megawatts ("MW") of output, will be kept in the capacity market and its subsidized bids will artificially suppress capacity market prices.  In the short term, the artificially suppressed market prices will harm competing generators.  In the longer term, generators that had lower actual costs than Dunkirk (and that would have survived but for the artificially suppressed prices) will exit the market, and investors that would have committed capital to construct new generators with lower actual costs than Dunkirk will be deterred from doing so.  Thus, contrary to FERC's objective, the market will fail to select the lowest-cost generators to meet New York's capacity needs.

7.     Ironically, NYPSC invoked, *inter alia*, the goal of "competitiveness of the electric market"[3] in support of this effort to disrupt the federally-mandated, market-based approach. NYPSC also invoked the goal of "meeting reliability needs,"[4] but FERC reaffirmed on February 19, 2015 that even short-term measures to keep a generator in operation for reliability reasons— and *a fortiori* a *ten-year* arrangement like that in the Term Sheet—must be governed by FERC-approved rules (not unilateral action by NYPSC) to ensure that they do not unduly interfere with the market-based approach.[5]

8.     More immediately, NYPSC's Order will alter the capacity market price paid to Dunkirk.  Under the Term Sheet, if the capacity market price exceeds certain amounts, Dunkirk will be required to pay a portion of its revenues from the auction to National Grid.  Additionally,

---

[3]  Order 27.

[4]  *Id.* at 29.

[5]  *N.Y. Indep. Sys. Operator, Inc.*, 150 FERC ¶ 61,116, at ¶ 11 (2015).

because Dunkirk is required by the Term Sheet to bid in the capacity auction, the stream of monthly payments from National Grid to Dunkirk (and the one-time subsidy from a New York State agency to Dunkirk) are extra compensation to Dunkirk beyond the price it would receive from the capacity auction.  In these ways, NYPSC's Order supplants the capacity market price that Dunkirk would receive from the FERC-approved market with a different price preferred by NYPSC.  NYPSC thus has invaded FERC's exclusive authority over "the sale of electric energy at wholesale in interstate commerce."  16 U.S.C. § 824(b)(1).

9.    Plaintiffs are Entergy Nuclear FitzPatrick, LLC ("FitzPatrick"), a generator located in Scriba, New York; Entergy Nuclear Power Marketing, LLC ("ENPM"), which markets and sells the power output from FitzPatrick in the interstate wholesale markets; and Entergy Nuclear Operations, Inc. ("ENOI"), which is the federally licensed operator of FitzPatrick.  FitzPatrick, ENPM, and ENOI will suffer harm as implementation of the Term Sheet artificially suppresses the wholesale market price.

10.    By this action, Plaintiffs seek a declaratory judgment that the NYPSC Commissioners' Order approving the Term Sheet is preempted by the FPA and invalid under the dormant Commerce Clause of the U.S. Constitution.  Plaintiffs further seek a permanent injunction requiring the NYPSC Commissioners to withdraw the Order and/or preventing the NYPSC Commissioners from continuing to treat the Order as valid and binding.

11.    The NYPSC Commissioners may believe that selective support of certain uneconomic generators is sound policy to improve "competitiveness of the electric market."  But FERC has disagreed in the closely analogous context of new generators entering the market, finding that "below-cost entry suppresses capacity prices," *PJM Interconnection L.L.C.*, 135 FERC ¶ 61,022, at ¶ 143 (2011), which in turn "undermine[s] the market's ability to attract

needed investment over time," *id.* at ¶ 16 (internal quotation marks and citation omitted). Especially where, as here, NYPSC has imposed its view by acting directly on a generator's receipt of the wholesale market price, its action falls within FERC's exclusive jurisdiction over wholesale rates, and is therefore preempted.  In two recent cases, the U.S. Courts of Appeals for the Third and Fourth Circuits reached exactly this conclusion in invalidating similar actions by New Jersey and Maryland authorities, respectively.  *See PPL EnergyPlus, LLC v. Solomon*, 766 F.3d 241, 253 (3d Cir. 2014), *pet. for cert. filed*, 83 USLW 3355 (Nov. 26, 2014) (No. 14-634); *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 476 (4th Cir. 2014), *pet. for cert. filed*, 83 USLW 364 (Dec. 10, 2014) (No. 14-694).  As the Fourth Circuit explained, such a "scheme . . . effectively supplants the rate generated by the auction with an alternative rate preferred by the state," *Nazarian*, 753 F.3d at 476, and "has the potential to seriously distort the . . . auction's price signals, . . . [upon which] [m]arket participants necessarily rely . . . in determining whether to construct new capacity or expand existing resources," *id.* at 478-79.[6]  NYPSC's scheme is likewise invalid.

## The Parties

12.    Plaintiff FitzPatrick is a limited liability company organized under the laws of Delaware.  FitzPatrick owns the James A. FitzPatrick Nuclear Power Plant located in Scriba, New York.

13.    Plaintiff ENPM is a limited liability company organized under the laws of Delaware.  ENPM sells the energy and capacity from FitzPatrick in interstate wholesale markets.

---

[6]  *See also* Br. For The United States And The Federal Energy Regulatory Commission As Amici Curiae at 9, *PPL EnergyPlus, LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014) (Nos. 13-4330, 13-4501), 2014 WL 1269993 ("The United States and the Commission [*i.e.*, FERC] are of the view that the New Jersey Act is preempted because of its price-suppressive and distorting effect on PJM's [*i.e.*, the regional wholesale market for Pennsylvania, New Jersey, and Maryland] wholesale capacity market prices.").

14.     Plaintiff ENOI is a corporation that is incorporated in Delaware and maintains its principal place of business in Mississippi.  ENOI is the federally licensed operator of FitzPatrick.

15.     Defendant Audrey Zibelman is Chair of the NYPSC and is sued here only in her official capacity.

16.      Defendant Patricia L. Acampora is a Commissioner of the NYPSC and is sued here only in her official capacity.

17.     Defendant Gregg C. Sayre is a Commissioner of the NYPSC and is sued here only in his official capacity.

18.     Defendant Diane X. Burman is a Commissioner of the NYPSC and is sued here only in her official capacity.

19.     This Court has personal jurisdiction over Defendants in their official capacities because each Defendant conducts a substantial portion of his or her duties as a Commissioner of NYPSC in the State of New York.

**Jurisdiction and Venue**

20.     This Court has subject-matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1331 (federal question) because the first claim seeks, through the Supremacy Clause and doctrines of preemption embodied therein, to interpret and to apply the Federal Power Act, 16 U.S.C. § 791a *et seq.*; and the second claim seeks, through 42 U.S.C. § 1983, to interpret and to apply the dormant Commerce Clause.  *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is preempted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.").

21.     On the FPA-based preemption claim, this Court is empowered to grant declaratory relief by 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, and this Court is empowered to grant injunctive relief by, *inter alia*, 28 U.S.C. §§ 1651(a) and 2202 and Federal Rule of Civil Procedure 65.

22.     On the dormant Commerce Clause claim, this Court is also empowered to grant declaratory and injunctive relief by 28 U.S.C. § 1983.  *See Dennis v. Higgins*, 498 U.S. 439, 440 (1991).

23.     This Court has jurisdiction to order prospective relief in the form of a declaratory judgment or an injunction against Defendants in their official capacities as officers of an agency of the State of New York.  *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645-46 (2002) (citing *Ex parte Young*, 209 U.S. 123, 129 (1908)).

24.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants perform their official duties in this District (NYPSC's main office is located in Albany), and because a substantial part of the events giving rise to this action occurred in this District.

### Substantive Allegations

**A.     Background On The Federal And State Spheres Of Authority Concerning The Transmission And Sale Of Electric Energy**

25.     Under the FPA, FERC possesses exclusive regulatory authority, to the exclusion of state and local governments, over "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce."  16 U.S.C. § 824(b)(1); *see also id.* § 824(d) (defining a "wholesale" sale as a sale of electric energy to a buyer "for resale" to another buyer); *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1982) (FPA "delegated to the Federal Power Commission, now [FERC], exclusive authority to regulate the

transmission and sale at wholesale of electric energy in interstate commerce, without regard to the source of production."). To understand this grant of exclusive authority, it is helpful briefly to discuss the history leading to the enactment of this FPA provision, and key developments in the energy market from 1935 through the present day.

26.     Prior to the enactment in 1935 of Part II of the FPA (which includes, *inter alia*, 16 U.S.C. § 824), "most electricity was sold by vertically integrated utilities that had constructed their own power plants, transmission lines, and local delivery systems. Although there were some interconnections among utilities, most operated as separate, local monopolies subject to state or local regulation. . . . Competition among utilities was not prevalent." *New York v. FERC*, 535 U.S. 1, 5 (2002).

27.     Some utilities in the early twentieth century sold power or standby capacity to utilities in neighboring states. This raised the question whether state or local authorities had authority to regulate such transactions. In 1927, the Supreme Court held that Rhode Island's effort to regulate a sale of electricity from a Rhode Island utility to a Massachusetts utility imposed a direct burden on interstate commerce and thus violated the dormant Commerce Clause of the U.S. Constitution. The interstate transaction, the Court reasoned, was for the federal government to regulate, not the states. *See Pub. Utils. Comm'n of R.I. v. Attleboro Steam & Electric Co.*, 273 U.S. 83, 90 (1927) ("*Attleboro*"), *abrogated on other grounds by Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 393 (1983). This resulted in a regulatory vacuum, as Congress had not yet granted to any federal agency regulatory authority over wholesale sales of electricity. *New York v. FERC*, 535 U.S. at 6.

28.     Congress filled this so-called "*Attleboro* gap" in 1935 by enacting Part II of the FPA, which vested FERC's predecessor with broad jurisdiction to regulate "the transmission of

electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1). In granting this broad authority to FERC, Congress drew a "bright line easily ascertained, between state and federal jurisdiction, . . . making [FERC's] jurisdiction plenary and extending it to all wholesale sales in interstate commerce except those which Congress has made explicitly subject to regulation by the States." *Fed. Power Comm'n v. S. Cal. Edison Co.*, 376 U.S. 205, 215-16 (1964).

29.     The scope of this interstate regulation grew over the years, as technological developments in the mid- to late-twentieth century made it increasingly possible to transmit energy over long distances. The primarily local delivery networks of the past gave way to the modern "grid" network in which the majority of electricity transported within the continental United States flows across one of two grids, the Eastern and Western Interconnects, subject to FERC jurisdiction.[7] When electricity enters into either grid, it "immediately becomes a part of a vast pool of energy that is constantly moving in interstate commerce." *New York v. FERC*, 535 U.S. at 7.

30.     With the emergence of a robust and interconnected network for the wholesale transmission and sale of electricity, local and largely autonomous networks became a thing of the past. Separation of the functions formerly performed by vertically integrated utilities became possible: One company might own the generation plant, selling its output at wholesale over transmission lines owned by a second company, for delivery to a third company, with the third company handling the final intrastate distribution of the power to retail customers. In other words, it became "possible for a customer in Vermont [to] purchase electricity from an

---

[7]     In addition to the Eastern and Western Interconnects, a third power grid, the Electric Reliability Council of Texas ("ERCOT") exists within the State of Texas. Except for a few limited ties, the ERCOT grid is electrically separate from the Eastern and Western Interconnects.

environmentally friendly power producer in California or a cogeneration facility in Oklahoma." *Id.* at 8 (internal quotation marks omitted; alteration in original). Although state authorities (here, NYPSC) retained their traditional jurisdiction over entities that make intrastate retail sales of power to customers, the expansion of the interstate wholesale market enlarged FERC's regulatory authority relative to that of state authorities. *See id.* at 23.[8]

31.     Under the FPA, FERC is empowered to regulate the interstate wholesale market to ensure, *inter alia*, that rates are "just and reasonable." 16 U.S.C. § 824d(a) ("All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.").

32.     "Rather than ensuring the reasonableness of interstate transactions by directly setting rates, FERC has chosen instead to achieve its regulatory aims indirectly by protecting the integrity of the interstate markets." *Nazarian*, 753 F.3d at 472 (internal quotation marks and citation omitted). One of FERC's key objectives is to rely on market processes "to bring more efficient, lower cost power to the Nation's electricity consumers." *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. by Pub. Utils.*, FERC Order No. 888, 61 Fed. Reg. 21,540, 21,541 (May 10, 1996).

---

[8]     New York, like other States, undertook its own complementary measures, including steps that led New York's vertically integrated utilities to divest their generation assets from their transmission and distribution holdings. *See, e.g.*, *In re Competitive Opportunities Regarding Elec. Serv.*, Case 94-E-0952, Op. No. 96-12 at 96-100, 168 P.U.R.4th 515 (NYPSC May 20, 1996).

**B.    The New York Independent System Operator, Inc. ("NYISO") And Its Auction Market For Capacity**

33.    "FERC has authorized the creation of 'regional transmission organizations' to oversee certain multistate markets." *Nazarian*, 753 F.3d at 472.  The regional transmission organization relevant to this case is the New York Independent System Operator, Inc. ("NYISO").  Although the buyers in NYISO's wholesale markets are predominantly entities that resell to customers and businesses located in New York, the sellers in NYISO's wholesale markets include generators located inside and outside New York.[9]  For example, for NYISO's August 2014 spot market capacity auction, Hydro-Québec (a Canadian generator) sold 478.4 MW and New England generators sold 110 MW.[10]  Like the markets overseen by other regional transmission organizations, NYISO's markets are considered interstate wholesale markets and are regulated by FERC.  *See, e.g.*, *N.Y. Indep. Sys. Operator, Inc.*, 150 FERC ¶ 61,116, at ¶ 1 (2015); *TC Ravenswood, LLC v. FERC*, 741 F.3d 112, 115 (D.C. Cir. 2013).

34.    NYISO's wholesale markets include the energy market and the capacity market. In the energy market, "generators sell actual power to retailers."  *TC Ravenswood*, 741 F.3d at 114.  In the capacity market, by contrast, generators sell retailers "the option to purchase electricity [*i.e.*, energy] in the future."  *Nazarian*, 753 F.3d at 472.  While the buyer of this option need not exercise the option by purchasing actual energy in the energy market (which purchase requires an additional payment from buyer to seller), the buyers' duty to purchase the option in the capacity market is mandatory in the first instance so as to ensure that sufficient capacity is available if needed.  *Keyspan-Ravenswood, LLC v. FERC*, 474 F.3d 804, 806 (D.C. Cir. 2007).

---

[9]    By contrast, NYISO's neighboring regional transmission organizations (with which NYISO is interconnected), ISO-New England and PJM, cover multiple states and thus their markets include buyers located in multiple states.

[10]    *See* http://icap.nyiso.com/ucap/public/auc_view_spot_detail.do (last visited Feb. 25, 2015).

35.    "[T]he price of capacity is indisputably a matter within FERC's exclusive jurisdiction." *N.E. Power Generators Ass'n v. FERC*, 757 F.3d 283, 290 (D.C. Cir. 2014); *see also id.* ("[T]he Commission has jurisdiction to regulate certain parameters of the capacity market related to the price of capacity, even if those determinations touch on states' authority."). FERC has explained that capacity markets "provide adequate revenues to appropriately compensate (and keep in service where needed for reliability) existing capacity resources and provide incentive for the development of new infrastructure in areas where it is most needed." *Devon Power LLC*, 115 FERC ¶ 61,340, at ¶ 62 (2006). Such markets relatedly seek to "reduce the risk and cost of financing investment in new generation capacity and thus reduce the cost of electricity to consumers in the long term." *Elec. Consumers Res. Council v. FERC*, 407 F.3d 1232, 1238 (D.C. Cir. 2005).

36.    Under a tariff that has been approved by FERC, NYISO requires that the buyers purchase certain levels of capacity in a mandatory "spot market auction," which is conducted separately for each of four sub-zones within the NYISO region. NYISO determines, subject to FERC's review and approval, the demand side of the equation: that is, the amount that the buyers, in the aggregate, must purchase based on an assessment of the need for power for the relevant period and the net cost of new entry in each of NYISO's four capacity zones. *See N.Y. Indep. Sys. Operator*, 103 FERC ¶ 61,201, at ¶¶ 6, 17 (2003).[11]

37.    On the supply side, generators offer to sell a certain amount of capacity at a certain bid. The bids are then "stacked" from lowest to highest, and bids are accepted until the

---

[11]    If a buyer has fulfilled its requirement, through optional capacity markets or bilateral contracts with generators, before the spot market auction is held, that buyer need not participate in the spot market auction. *Installed Capacity Manual* § 2.1 at 2-2 (NYISO Oct. 2014), http://www.nyiso.com/public/webdocs/markets_operations/documents/Manuals_and_Guides/Manuals/Operations/icap_mnl.pdf (last visited Feb. 25, 2015).

requisite total demand has been met.  The last and highest bid price needed to meet the demand establishes the market-clearing price.  Any generator that had bid below or at this price "clears" the market and is paid the clearing price.  Such a generator in turn is generally obligated to deliver, if called upon one month later, the amount of electric energy to match the capacity that had cleared the auction in that generator's accepted bid.  By contrast, those bidders that had offered above the clearing price are not selected, receive no payment, and have no obligation. *See Simon v. KeySpan Corp.*, 694 F.3d 196, 199 (2d Cir. 2012) (discussing NYISO's capacity market); *Nazarian*, 753 F.3d at 472 (describing similar auction conducted by PJM, NYISO's neighboring regional transmission organization).

38.    For example, if NYISO determines that demand is 20 MW, Generator A offers capacity of 10 MW for $10, Generator B offers capacity of 10 MW for $15, and Generator C offers capacity of 10 MW for $20, the clearing price will be $15.  Generators A and B will be paid that amount and have a capacity obligation to deliver 10 MW each, and Generator C is paid nothing and has no capacity obligation.

39.    According to NYISO, the auction's stacking mechanism (from lowest to highest) "creates [an] incentive for capacity providers to be efficient and cost effective in order to be selected.  Further, it creates price signals for new capacity to enter the market if it can supply capacity at prices below the clearing price. At the same time, the market provides price signals for existing suppliers to exit the market if they are unable to beat the clearing price." *NYISO Markets:  New York's Marketplace for Wholesale Electricity* 5.[12]

---

[12] *Available at* http://www.nyiso.com/public/webdocs/media_room/publications_presentations/Other_Reports/Other_Reports/NYISO%20Markets%20-%20New%20Yorks%20Marketplace%20for%20Wholesale%20Electricity.pdf (last visited Feb. 25, 2015).

40.    Generators that sell on the wholesale markets (sometimes called merchant generators), unlike local utilities, do not have rate-paying homeowners and businesses onto whom they can pass their costs.  Instead, such generators must, to remain viable, recover sufficient revenues from the wholesale markets to cover their actual costs over the long term.  It follows that such generators will bid at prices sufficient to enable them to cover those costs over the long term.[13]

41.    If, however, a particular generator is required to bid in the capacity auction and also receives subsidies from a state or a local utility at the direction of a state, the subsidies will cover a part of the generator's costs and the generator need not recover all of its actual costs through payment from the auctions.  This enables an otherwise uneconomic generator to bid below its actual going-forward costs over the long term.  Given the stacking mechanism described above, the uneconomic generator's below-cost bids will over the long term lead to clearing prices being below what they would have been absent the subsidies.

42.    Returning to the example above, suppose that Generator C, whose true costs are $20 to produce 10 MW, receives an out-of-market subsidy of $16 and thus revises its bid from $20 to $4 in the auction.  Then, because Generator A still bids $10 and Generator B still bids $15, the clearing price will now be $10 (as compared to the $15 clearing price absent the subsidy), and Generator A's and Generator C's bids will be accepted while Generator B's bid is

---

[13]    Some generators may submit low bids to ensure that their bids clear, believing that the clearing prices will exceed their actual costs over the long term.  Thus, in the above example, if Generator A (the low-cost generator) bids $0, the clearing price of $15 will still be above Generator A's actual cost of $10.  Generator C (the high-cost generator) may also submit a bid (such as $0) below its actual costs to ensure that it clears a particular month's auction, but if this strategy does not yield sufficient revenues to cover Generator C's actual costs, Generator C will eventually be forced to exit.  However, as discussed in Paragraph ¶ 41 in text, in the case of an uneconomic generator like Dunkirk that is required to bid in the capacity market and is compensated in part by out-of-market subsidies, long-term survival is possible even though the generator bids below its actual costs.

rejected. Thus, in the present, a higher-cost generator (Generator C) will now be selected in place of a lower-cost generator (Generator B). And Generator A, even though its bid is accepted, will now earn less revenue ($10 rather than $15).[14]

43.    In the longer term, Generator B, and even Generator A, may not receive enough revenue from these artificially suppressed market clearing prices to ensure that these lowest-cost generators are kept in operation. The lower market clearing prices will discourage investment in new generators as well. This will cause supply to be reduced and the market price to increase, absent yet further subsidies. In the analogous context of entry into the market by a new uneconomic generator (here, Dunkirk is an existing uneconomic generator being kept in the market), FERC has expressly criticized these consequences of interference with the market, concluding that "below-cost entry suppresses capacity prices," *PJM Interconnection L.L.C.*, 135 FERC ¶ 61,022, at ¶ 143, which in turn "undermine[s] the market's ability to attract needed investment over time," *id.* at ¶ 16 (internal quotation marks and citation omitted). *See also N.Y. Indep. Sys. Operator, Inc.*, 147 FERC ¶ 61,152 at ¶ 16 (2014) (inefficiently low price signals "discourage[] construction of new capacity and encourage[] premature capacity retirements").

## C.    Dunkirk's And National Grid's Determinations That The Uneconomic Dunkirk Plant Should Be Mothballed

44.    Dunkirk is a generator that sells its energy and its capacity in NYISO's interstate wholesale markets. As a merchant generator, Dunkirk must, to remain viable, obtain sufficient revenues to cover its costs through arms-length market transactions. In March 2012, Dunkirk announced that its facility was no longer viable under this metric, and so announced its plan to "mothball" the facility. Dunkirk explained that it "is and would continue to be operating at a net

---

[14]    Although Generator C might, as discussed in text, bid $4, Generator C potentially will bid a lower amount (even $0) to guarantee that it clears the auction.

loss" and is therefore "not currently economic and is not expected to be economic."  Letter from

NRG Energy, Inc. to NYPSC, Case No. 12-E-0136, at 2 (NYPSC Mar. 14, 2012).[15]

45.    Dunkirk's retirement potentially created reliability issues in western New York.

NYISO defines "reliability" as "[t]he sustained dependability of electric service."[16]  Reliability

has two components: resource adequacy (ensuring sufficient overall supply to meet overall

demand) and transmission system reliability (ensuring that the energy can be carried from its

source to the particular places within a region where it is needed).  In Dunkirk's case, the

potential concern involved transmission system reliability.  Possible solutions included

developing new operating procedures, constructing new transmission facilities, keeping the

existing generator in operation, or constructing new generation in the same area.

46.    National Grid—a retail utility that purchases power on the wholesale market and

resells it to homeowners and businesses in western New York—is among the entities that are

under NYPSC's close regulatory oversight in its role as regulator of the *retail* sale of electric

energy in New York.  *See, e.g.*, N.Y. PUB. SERV. LAW § 66(1)-(2), (5).  NYPSC called upon

National Grid to address whether Dunkirk's retirement raised reliability concerns, and how any

such concerns should be addressed.  Order Deciding Reliability Issues and Addressing Cost

Allocation and Recovery, Case No. 12-E-0136 (NYPSC Aug. 16, 2012).  In response, National

Grid "proposed transmission solutions that will address the associated reliability impacts . . . ."

Order Instituting Proceeding and Evaluation of Generation Repowering, Case No. 12-E-0577, at

2 (NYPSC Jan. 18, 2013) (describing National Grid's position).  NYPSC then directed National

---

[15]    NYPSC filings may be accessed by entering the case number on the NYPSC's web site,    http://www3.dps.ny.gov/W/PSCWeb.nsf/All/B428BB2B680CD9B485257687006F3890 (last visited Feb. 26, 2015).

[16]    http://www.nyiso.com/public/about_nyiso/importance_of_reliability/index.jsp  (last visited Feb. 26, 2015).

Grid to explore keeping Dunkirk in operation as a repowered plant as a measure to address reliability over a ten-year term. *Id.* at 3.

47.    In May 2013, National Grid submitted a further response explaining that transmission improvements were the most efficient solution, and that repowering Dunkirk as a natural gas-fired (rather than coal-fired) plant was not simply an idea that had escaped National Grid's attention.  National Grid again recommended that "transmission solutions be implemented as being less risky and less costly to ratepayers than any of [Dunkirk's] proposals [regarding repowering]."  Order Addressing Repowering Issues and Cost Allocation and Recovery, Case No. 12-E-0577, at 4 (NYPSC June 13, 2014) ("Order") (describing National Grid's position).

48.    National Grid also explained, with support from expert testimony, that propping up the uneconomic Dunkirk plant with out-of-market payments would artificially suppress prices in the wholesale capacity market, with damaging long-term effects:

> It is unlikely that inefficient entry will have a significant and lasting impact on prices, as other market participants are likely to respond by mothballing or retiring generating capacity, which could largely or completely offset the impact of the new generation on prices, leaving consumers with the obligation to purchase energy and capacity provided by inefficient generators at above-market costs.  Economically inefficient entry that is supported through out-of-market contracts could also undermine the ability for the market to support economically efficient entry, as prospective developers may fear that the market prices they would receive would be suppressed through such contracts.

Affidavit of Michael Cadwalader, Atlantic Economists, LLC, Ex. 7 of National Grid Report And Recommendations Comparing Repowering Of Dunkirk Power LLC And Transmission System Reinforcements, Case No. 12-E-0577, at 1 (NYPSC May 17, 2013); *see also*, *e.g.*, *Nazarian*, 753 F.3d at 478-79 ("[T]he Generation Order has the potential to seriously distort the PJM auction's price signals, thus interfer[ing] with the method by which the federal statute was designed to reach its goals.  PJM's price signals are intended to promote a variety of objectives, including

incentivizing new generation sources.  Market participants necessarily rely on these signals in determining whether to construct new capacity or expand existing resources.") (second alteration in original; internal quotation marks and citations omitted); *PJM Interconnection L.L.C.*, 135 FERC ¶ 61,022, at ¶¶ 143, 16 ("below-cost entry suppresses capacity prices," which in turn "undermine[s] the market's ability to attract needed investment over time") (internal quotation marks and citation omitted).

49.    National Grid compared the long-term consequences to National Grid's retail ratepayers of keeping Dunkirk in operation, on the one hand, with undertaking transmission upgrades, on the other hand.  National Grid concluded that "the repowering options [to keep Dunkirk in operation as a natural gas-fired plant] would cost National Grid customers three to seven times more per year than the transmission solutions."  Comments of National Grid on Comparison of Repowering Dunkirk Power, LLC and Transmission System Reinforcements, Case No. 12-E-0577, at 1 (NYPSC Aug. 16, 2013).  National Grid reaffirmed that transmission upgrades "are a far more economic solution" to reliability concerns than is repowering, *id.* at 14, and that "[t]he Dunkirk plant is clearly not economic.  If it were, NRG would not have proposed to mothball the facility," *id.* at 10.  Indeed, National Grid determined that other system issues required that some of its proposed transmission upgrades were needed irrespective of Dunkirk's retirement.  *See* National Grid Submission In Response To Aug. 23, 2014 Notice Requiring Additional Information, Case No. 12-E-0577 (NYPSC Sept. 4, 2013).  According to National Grid, with that upgrade in place, there would be a need for only about 150 MW (rather than 435

MW) of capacity—whether from other additional transmission or generation resources—to satisfy any future reliability need over the next ten years.[17]

### D.    Governor Cuomo's Announcement Of An Agreement To Keep Dunkirk In Operation, And NYPSC's Approval Of The Related Term Sheet

50.    On December 15, 2013, however, Governor Cuomo issued a press release announcing that National Grid and Dunkirk had agreed in principle to an arrangement under which Dunkirk would be kept in operation, repowered as a natural gas-fired rather than coal-fired plant.[18]  The press release asserted, *inter alia*, that the agreement would "bring lower electric supply costs to consumers."[19]

51.    Soon thereafter, NYPSC issued a Notice requiring National Grid and Dunkirk to file with NYPSC the terms of the proposed agreement.  *See* Notice of Filing Deadline, Case No. 12-E-0577 (NYPSC Dec. 23, 2013).  On February 13, 2014, National Grid did so.  *See* Statement of Niagara Mohawk Power Corp. d/b/a National Grid in Support of Term Sheet Arrangement,

---

[17]  To the extent transmission upgrades cannot be completed immediately, this does not leave transmission system reliability concerns without a solution.  Wholesale generators may petition FERC under FPA Section 205, 16 U.S.C. § 824d, for cost-based service in the face of such reliability needs.  Additionally, some regional transmission organizations have the authority to approve short-term agreements in instances where a generator's retirement may cause reliability problems on the transmission system.  These agreements, known as "reliability must run" ("RMR") agreements, permit an uneconomic generator needed for transmission reliability to recover the costs necessary for it to remain online.  In fact, FERC recently initiated a new proceeding directing NYISO to revise its tariff to include provisions governing RMR agreements.  *See N.Y. Indep. Sys. Operator, Inc.*, 150 FERC ¶ 61,116.  But, as FERC emphasized, "RMR agreements should be of a limited duration so as to not perpetuate out-of-market solutions that have the potential, if not undertaken in an open and transparent manner, to undermine price formation."  *Id.* at ¶ 2.  Thus, "RMR agreements are [to be] used only as a limited, last-resort measure."  *Id.* at ¶ 16.

[18]  http://www.governor.ny.gov/news/governor-cuomo-announces-dunkirk-power-plant-be-repowered-and-expanded-cost-effectively-meet (last visited Feb. 26, 2015).

[19]  *Id.*

Case No. 12-E-0577 (NYPSC Feb. 13, 2014) ("Statement").[20]  The proposed agreement, called

the "Term Sheet," includes the following key provisions:

- Repowering of Dunkirk Units 2, 3, and 4, with a capacity of 435 MW, from coal-to natural gas-fired, with a targeted in-service date of September 1, 2015.  *See* Attachment 1 to Statement, Case No. 12-E-0577, at 1 (NYPSC Feb. 13, 2014) ("Term Sheet").

- A duration of ten years from the in-service date.  *See id.*

- A requirement that Dunkirk participate in NYISO's month-ahead spot market auction for capacity.  *See id.* at 4 ("Energy, Capacity, and Ancillary Services—Units bid in compliance with existing NYISO market rules and Seller retains all revenues."); *id.* (describing Dunkirk's obligations in the energy market "irrespective of whether Dunkirk Power's capacity bid has been accepted for such period").[21]

- An annual payment from National Grid to Dunkirk of $20,410,000 (or $1,700,833.33 per month) over the ten-year duration of the agreement, subject to pro rata reductions to the extent that Dunkirk is out of service for more than 6 months.  *See id.* at 7.

- A payment of "$15 million assistance from the appropriate agency [of the State of New York]" to Dunkirk.  *Id.* at 11.

---

[20]  A copy of National Grid's cover letter (with its Statement and the Term Sheet) is attached to this Complaint as Exhibit B.

[21]  Even aside from this Term Sheet provision, NYISO's rules require a non-retired generator that sells into the energy market on a daily basis (as Dunkirk must, *see* Term Sheet 4) to participate in the capacity auction, and such a generator's failure to do so would trigger an investigation.  *See generally* NYISO Market Administration and Control Area Services Tariff, Attachments H & O; *2014 Annual Installed Capacity Report: Report on the NYISO's Capacity Market, Possible Withholding, New Generation Projects, and Net Revenue Analysis*, at 21-33 (Dec. 19, 2014), *available at* http://www.nyiso.com/public/webdocs/markets_operations/services/market_monitoring/ICAP_Market_Mitigation/Annual_ICAP_Report/2014_12_19_NYISO%20ICAP%20Annual%20Report%202014%20PUBLIC.pdf (last visited Feb. 26, 2015).  Dunkirk also would have a clear economic incentive to bid in that auction because the annual $20.41 million payments from National Grid and the additional $15 million subsidy from a New York agency are insufficient to fund the repowering project and the ongoing cost of operating the facility.

- A requirement that "Dunkirk shall pay National Grid a capacity credit (the 'Sharing Amount') provided average capacity prices exceed a threshold price during the applicable sharing period." *Id.* at 5.

52.    Both the $20.41 million annual payments from National Grid to Dunkirk and the $15 million one-time payment from an "appropriate" New York State agency to Dunkirk are out-of-market payments to Dunkirk that will enable Dunkirk to bid below its actual costs in NYISO's capacity auction and lead to artificial suppression of the market clearing price, harming competing generators in the short term and harming consumers in the long term when (absent further NYPSC intervention) supply is reduced and prices rise. *See supra*, ¶¶ 37-43. Tellingly, in submitting the Term Sheet, National Grid acknowledged that "market response" to suppressed wholesale prices from Dunkirk's repowering was "not considered" by National Grid's consultants and "would likely affect the ability to realize such savings over the term of the agreement." Statement 11.

53.    The Term Sheet elaborates on the mechanics of the requirement, described in the final bullet point above, that Dunkirk share with National Grid a portion of its revenues from sales of capacity on the interstate wholesale market overseen by NYISO. The sharing amount is paid once for the first five-year period of the Term Sheet and a second time for the second five-year period of the Term Sheet. *See* Term Sheet 5-6. Under an illustrative example provided in the Term Sheet, during the first five-year period of the Term Sheet, Dunkirk would be required to pay $12.26 million of its revenues from the NYISO capacity auction to National Grid. *See id.*[22]

---

[22]    It is nearly impossible that the sharing amount will *exceed* the amount of the payments to Dunkirk from National Grid, and there is no reason to believe Dunkirk's bids will reflect any such expectation. Accordingly, the sharing amount will still leave Dunkirk, on net, as a generator subsidized by out-of-market payments.

54.     The following graph depicts the difference for the first five-year period of the Term Sheet between, on the one hand, the wholesale capacity market revenue that Dunkirk nominally receives from the NYISO auction and, on the other hand, the amount that Dunkirk is allowed by the Term Sheet to keep.  The y-axis is dollars, and the x-axis takes into account various possible "Historic Capacity Prices" (the Term Sheet uses "Historic" to mean looking backward over the first five-year portion, and later the second five-year portion, of the contract, and hence will not be known until 2020 for the first five-year portion and 2025 for the second five-year portion):[23]



55.     The Term Sheet adjusts the wholesale market price received by Dunkirk in another sense as well.  A generator's revenue from its sale of capacity is, as described above, the clearing price multiplied by the amount of power that that generator had offered in its accepted

---

[23]     This graph was produced using the reference prices specified in the FERC-approved demand curves filed by NYISO for 2014-17, with an assumed escalation factor of 2% per year, and an assumed average Unforced Capacity (*i.e.*, the amount that Dunkirk qualifies to bid into the capacity market) equal to 435 MW.

bid.  But in the case of Dunkirk, under the Term Sheet, it receives monthly payments of $1,700,833.33 from National Grid and a $15,000,000 one-time payment from a New York State agency.  Because the Term Sheet (as well as other requirements and incentives outside the Term Sheet, *see* n.21, *supra*) require Dunkirk to bid in each capacity auction, these payments constitute extra compensation to Dunkirk, above and beyond its revenue from the auction, for the sale of capacity on NYISO's interstate wholesale market.  They provide a "floor" below which Dunkirk's capacity revenues will never fall.  Moreover, the fact that the Term Sheet provides for *pro rata* reduction of the payments to the extent Dunkirk is out of service for six months or more, *see* Term Sheet 6-7, underscores that the payments are out-of-market compensation for Dunkirk providing capacity because the essence of a capacity obligation is that the generator will be online and available to deliver actual power.

56.    The Term Sheet recognizes that it cannot take effect until it is approved by NYPSC.  Term Sheet 9.  On June 13, 2014, NYPSC issued an Order granting that approval.  *See* Order.  NYPSC explicitly relied, *inter alia*, on "competitiveness of the electric market" in support of its Order.  *Id.* at 27; *see also id.* at 29 (stating that the Term Sheet will "reduce[] costs for consumers").

57.    But NYPSC then disregarded this goal in rejecting a FPA preemption argument, now relying only on NYPSC's asserted authority to ensure "'reliability of electric service within [New York].'"  *Id.* at 38 (quoting 16 U.S.C. § 824o(i)(3)).  NYPSC likewise ignored that the Term Sheet's mechanism involves an alteration of the wholesale market price by requiring Dunkirk to share a portion of its capacity revenues with National Grid and by providing Dunkirk with out-of-market payments in exchange for Dunkirk's obligation to bid in the capacity markets.  On October 27, 2014, NYPSC denied rehearing of the Order.  *See* Order Denying

Petition For Rehearing, Case No. 12-E-0577 (NYPSC Oct. 24, 2014); Erratum Notice, Case No. 12-E-0577 (NYPSC Oct. 28, 2014) (noting that the Order Denying Petition For Rehearing had been erroneously dated October 24, 2014, when it had in fact been issued on October 27, 2014, and correcting this error).

58.     A state's authority to ensure reliability does not give the state license to regulate areas exclusively reserved to FERC or to use overly broad measures that harm key FERC objectives like employing market processes to ensure just and reasonable rates.  *See, e.g.*, *Nazarian*, 753 F.3d at 477 (rejecting argument that Maryland order "falls on the state side of the jurisdictional line, since it is designed to ensure that Maryland enjoys an adequate supply of generation capacity").

59.     On February 19, 2015, FERC reaffirmed that it has jurisdiction to address the rates, terms, conditions, and market impacts of so-called Reliability Must Run (or "RMR") services.  These services and related agreements typically "provide for the retention of generation units wishing to deactivate, often because they have become uneconomic, but which are needed for transmission system reliability."  *N.Y. Indep. Sys. Operator, Inc.*, 150 FERC ¶ 61,116, at ¶ 1.  FERC directed NYISO to propose, within 120 days, rules "governing the retention of and compensation to generating units required for reliability, including procedures for designating such resources, the rates, terms and conditions for RMR service, provisions for the allocation of costs of RMR service, and a *pro forma* service agreement for RMR service."  *Id.* at ¶ 4.  (At present, the NYISO tariff, unlike the tariffs of some other regional transmission organizations, does not have such rules governing RMR agreements.)  FERC emphasized that its policy regarding RMR agreements is intended to ensure that short-term measures to address reliability are of sufficiently "limited duration so as to not perpetuate out-of-market solutions that

have the potential, if not undertaken in an open and transparent manner, to undermine price formation." *Id.* at ¶ 2.

60.    FERC specifically ruled that RMR services are "FERC-jurisdictional" services, *id.* ¶ 9, that must be provided "pursuant to the provisions of [NYISO's] [FERC]-jurisdictional Tariff required by this order to be filed with [FERC]," *id.* at ¶ 3.  Relatedly, FERC emphasized that "*NYISO is uniquely positioned to assess the potential impacts RMR agreements may have on its markets in New York.*"  *Id.* (emphasis added); *see id.* at ¶¶ 9, 14 (same).  FERC's focus on the FERC-jurisdictional nature of RMR services and the role of "NYISO" indicates, consistent with preemption case law, that NYISO (under rules approved by FERC)—not NYPSC unilaterally— should address and regulate the rates, terms, conditions, and market impacts associated with these types of reliability measures.

61.    Whether and when the FERC proceeding results in a revised NYISO tariff with RMR provisions will affect only NYISO's review of RMR agreements under that revised tariff. It will not avoid the need through the instant action to invalidate NYPSC's approval of the ten-year Term Sheet here, which (a) is a unilateral action by NYPSC without NYISO's involvement; and (b) involves an arrangement of ten-year duration, as opposed to an RMR agreement that typically lasts only a few years at most.[24]

---

[24]    Nor is the need for this action removed by the pendency at FERC of a complaint by the Independent Power Producers of New York, Inc. (of which Plaintiff ENPM is a member) that asks FERC to modify NYISO's tariff to address market impacts of subsidized generators such as Dunkirk. *See Indep. Power Producers of N.Y., Inc. v. N.Y. Indep. Sys. Operator, Inc.*, Dkt. No. EL 13-62 (FERC) (complaint filed May 10, 2013; motion to amend complaint to add allegations concerning Term Sheet filed March 25, 2014).  This action, by contrast, focuses on whether NYPSC was preempted or otherwise barred from approving the Term Sheet in the first instance. *Cf. Nazarian*, 753 F.3d at 479 ("The fact that FERC was required to mitigate the [Maryland Public Service Commission's] Generation Order's distorting effects . . . tends to confirm rather than refute the existence of a conflict.").

**E.    Ongoing Harm From The Term Sheet And NYPSC Approval Order And
Their Implementation**

62.    As set forth above generally as to FERC-endorsed market auction processes, *see
supra*, ¶¶ 37-43, and specifically as to the FERC-approved spot market capacity auction in
NYISO, *see supra*, ¶ 52, state intervention in normal competitive market processes prevents the
auction from selecting the lowest-cost generators (including potential new entrants) over higher-
cost generators.  In turn, the market clearing price fails to send the correct signals to incentivize
subsidized higher-cost generators to exit the market, lower-cost generators to remain in the
market, and new generators to enter the market.  In the long term, the lower-cost generators that
are not beneficiaries of artificial state intervention through receipt of out-of-market subsidies
may exit the market prematurely.  Over time, these interferences with the market will supplant
ordinary market dynamics, reducing supply and driving up the price to the local utilities that
purchase at wholesale, and ultimately to the homeowners and businesses that are their retail
customers.

63.    Competing generators suffer their own pecuniary harms from the state's market
interference because those generators receive the artificially suppressed clearing price rather than
the higher price that would otherwise have resulted.  According to a study commissioned by
National Grid, the extent of artificial suppression of the wholesale price will be substantial,
amounting to some $1.1 billion ($841 million in net present value terms) in decreased capacity
payments.  *See* Exhibit 6 to National Grid Report and Recommendations Comparing Repowering
of Dunkirk Power LLC and Transmission System Reinforcements, No. 12-E-0557, at 16 (May
17, 2013); *see also* Statement 11.

64.    In the short term, because those other generators (including Plaintiff FitzPatrick)
will receive lower revenues, they effectively will pay for most of the true costs of the Order and

Term Sheet.  FitzPatrick's affiliates ENPM and ENOI also will be harmed as a result of their relationships with FitzPatrick.  In the long term, some generators may be forced to exit the market.

**Claims For Relief**

**COUNT I**
**FEDERAL POWER ACT PREEMPTION UNDER THE SUPREMACY CLAUSE**
**(Declaratory Judgment and Injunctive Relief)**

65.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth in paragraphs 1-64 as if fully set forth herein.

66.    Under the FPA, 16 U.S.C. § 824(b), FERC has exclusive regulatory jurisdiction over the sale of electric energy and the sale of capacity at wholesale in interstate commerce, and a state is preempted from regulating in that field with no need for "a case-by-case analysis of the impact of state regulation upon the national interest."  *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986) (quoting *Fed. Power Comm'n v. S. Cal. Edison Co.*, 376 U.S. 205, 215 (1964)) (internal quotation marks omitted).  "The federal scheme . . . 'leaves no room either for direct state regulation of the prices of interstate wholesales of [energy], or for state regulations which would indirectly achieve the same result.'"  *Nazarian*, 753 F.3d at 475 (quoting *N. Natural Gas Co. v. State Corp. Comm'n*, 372 U.S. 84, 91 (1963)) (second alteration in original).

67.    NYPSC's Order is preempted under either or both of two preemption doctrines.

68.    *First*, the Order is field-preempted.  NYISO's spot market capacity auction is a wholesale interstate market for the sale of energy and therefore falls within the field of FERC's exclusive authority.  NYPSC's Order invades that field because it functionally sets the wholesale price that Dunkirk receives for its sales of capacity in the NYISO auction.

28

69.     Specifically, Dunkirk is required to bid into the NYISO spot market auction for capacity.  The Order and the underlying Term Sheet require such participation, as do NYISO rules governing non-retired generators that sell energy into the energy market on a daily basis. Further, Dunkirk's economic incentives *de facto* require it to bid its capacity into the auction, because the payments from National Grid and a New York agency will not suffice by themselves to cover Dunkirk's costs.

70.     Once Dunkirk's offer in a capacity auction is accepted, Dunkirk is entitled under FERC-approved rules to the market clearing price, which is the wholesale market price.

71.     NYPSC's Order invades FERC's exclusive regulatory field by directly altering the wholesale market price with regard to Dunkirk.  Under a variety of circumstances, the Order and underlying Term Sheet require Dunkirk to remit a portion of the revenues to National Grid as a so-called "sharing amount."  Under the illustrative example provided in the Term Sheet, Dunkirk must remit $12.26 million of the revenues to National Grid over the first five years of the ten-year duration of the Term Sheet.  The Order and Term Sheet also alter the wholesale market price by providing Dunkirk out-of-market payments ($20.41 million per year from National Grid and $15 million from a State agency) in exchange for the requirement that Dunkirk participate in the capacity market over the ten-year duration of the Term Sheet.  In these ways, the Order effectively replaces the clearing price generated by the auction with an alternative price preferred by NYPSC.

72.     *Second*, NYPSC's Order is conflict-preempted because the Order "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress [in the FPA]."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (internal quotation marks omitted).

73.    Specifically, as the agency charged with implementing the FPA, one of FERC's key objectives is to rely on market processes "to bring more efficient, lower cost power to the Nation's electricity consumers." *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. by Pub. Utils.*, 61 Fed. Reg. at 21,541; *see also N.Y. Indep. Sys. Operator, Inc.*, 150 FERC ¶ 61,116, at ¶ 2 ("The [FERC] has emphasized that RMR agreements should be of a limited duration so as to not perpetuate out-of-market solutions that have the potential, if not undertaken in an open and transparent manner, to undermine price formation.") (footnote omitted).  As NYISO has explained, the auction market process "creates [an] incentive for capacity providers to be efficient and cost effective in order to be selected. Further, it creates price signals for new capacity to enter the market if it can supply capacity at prices below the clearing price.  At the same time, the market provides price signals for existing suppliers to exit the market if they are unable to beat the clearing price." *NYISO Markets:  New York's Marketplace for Wholesale Electricity* 4.  The proper functioning of this auction market depends upon generators bidding at a level that will cover their actual costs over the long term.

74.    NYPSC's Order, however, purporting to pursue the goal of "electric market competitiveness," takes a fundamentally different approach by requiring Dunkirk to bid in the capacity market, aided by out-of-market subsidies that will lead Dunkirk to bid below its actual cost over a lengthy ten-year period of time.  With Dunkirk bidding up to 435 MW of capacity into the NYISO spot market capacity auction below Dunkirk's true costs, the clearing price of the auction will be artificially suppressed.  This will risk certain generators' bids being rejected even though (absent Dunkirk's subsidized participation) they would have cleared the auction; and it also will under-compensate even those generators whose bids are accepted.  In the longer term, the market's signals will be disrupted.  Dunkirk, even though uneconomic, will stay in

operation, generators that are otherwise economic will exit the market because they are suffering from an artificially suppressed price and thus lower revenues, and investors will be discouraged from financing new economic generators.  Supply will then be reduced and the market price will increase, absent yet further subsidies.

75.    In this way, NYPSC's Order stands as an obstacle to FERC's approach, which depends upon the functioning of the auction market without interference from out-of-market subsidies.  FERC has explained in the closely analogous context of new generators entering the market that "below-cost entry suppresses capacity prices," *PJM Interconnection L.L.C.*, 135 FERC ¶ 61,022, at ¶ 143, which in turn "undermine[s] the market's ability to attract needed investment over time," *id.* at ¶ 16 (internal quotation marks and citation omitted).  NYPSC's Order effectively supplants FERC's scheme with NYPSC's preferred approach.  And NYPSC's Order is especially problematic in two respects.  *First*, as discussed above, it does not give Dunkirk the auction clearing price, but an amount less than that price in one sense (because Dunkirk must remit part of the revenues to National Grid) and more than that price in a second sense (because Dunkirk receives monthly payments from National Grid and a one-time payment from a New York state agency in exchange for the requirement that Dunkirk bid in NYISO's spot market capacity auction).  *Second*, the Term Sheet approved by the Order has a substantial duration (ten years).

76.    Plaintiffs seek a declaration that NYPSC's Order is preempted by federal law and thus invalid.

77.    Plaintiffs further seek a permanent injunction requiring the NYPSC Commissioners to withdraw the Order and/or preventing the NYPSC Commissioners from continuing to treat the Order as valid and binding.

**COUNT II**
**UNCONSTITUTIONAL DISCRIMINATION AGAINST AND BURDEN ON**
**INTERSTATE AND INTERNATIONAL COMMERCE UNDER**
**DORMANT COMMERCE CLAUSE AND 42 U.S.C. § 1983**
**(Declaratory Judgment and Injunctive Relief)**

78.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth in paragraphs 1-77 as if fully set forth herein.

79.    In addition to being preempted by the FPA, NYPSC's Order is invalid under the "dormant" aspect of the Commerce Clause, U.S. Const. art. I, § 8, which prohibits states from discriminating against or unduly burdening interstate or international commerce.  *See, e.g.*, *Edgar v. MITE Corp.*, 457 U.S. 624, 643-45 (1982) (state action is invalid under dormant Commerce Clause where it imposes burdens on interstate commerce that are excessive in relation to purported local benefits); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 & n.4 (1951) (state action benefitting one region of a state may impose impermissible burden on interstate commerce even if it also burdens commerce originating elsewhere in the same state); *Selevan v. New York Thruway Auth.*, 584 F.3d 82, 94 (2d Cir. 2009) (state action that "discriminates against interstate commerce . . . is virtually invalid *per se*") (quotation marks omitted); *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006) (invalidating state statute under dormant foreign Commerce Clause).

80.    NYISO's wholesale markets are interstate and international in nature, involving the purchase and transmission of energy and capacity from, *inter alia*, generators located in other states and in Canada.  Moreover, even aside from the participation of those out-of-state generators, the NYISO markets are interstate markets.

81.    NYPSC's Order impermissibly discriminates against interstate and international commerce.  Rather than responding to any potential reliability concerns arising from Dunkirk's

announced retirement by pursuing transmission system upgrades that would have treated in-state and out-of-state generators equally, NYPSC opted to bestow hundreds of millions of dollars in benefits on a single New York generator, Dunkirk.

82.     NYPSC asserted in the Order that it was seeking to achieve localized benefits in the form of additional jobs and property tax revenue, *see* Order 8-9, as well as short-term reductions in local retail rates.  Such an attempt to "[p]reserve[e] . . . local industry by protecting it from the rigors of interstate competition is the hallmark of the economic protectionism that the Commerce Clause prohibits."  *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 205 (1994).

83.     The discriminatory out-of-market subsidies to Dunkirk will place substantial burdens on Dunkirk's competitors, which will be forced to accept lower capacity prices on the NYISO wholesale capacity market.  The Term Sheet will artificially suppress the capacity market price and consequently will diminish revenues to wholesale capacity sellers (including sellers located outside New York) by hundreds of millions of dollars.

84.     No legitimate state interest justifies NYPSC's discriminatory action.  For example, any need to preserve system reliability could be achieved through transmission upgrades that would not discriminate against interstate or international commerce.

85.     Even if NYPSC's Order were not directly discriminatory, it would be invalid under the dormant Commerce Clause because it imposes burdens on interstate and international commerce that clearly outweigh any putative local benefits.

86.     By approving the Term Sheet and its out-of-market subsidies to Dunkirk, the Order will impose substantial burdens on sellers (including sellers located outside New York) in NYISO's interstate wholesale capacity market, by artificially suppressing the market price and consequently diminishing those sellers' revenues by hundreds of millions of dollars.

87.     NYPSC's approval and ongoing implementation of the Term Sheet will also have consequences in interstate wholesale markets outside NYISO.  Because the Term Sheet will artificially suppress NYISO's capacity price, generators will prefer, where possible, to sell their capacity in wholesale markets other than NYISO.  This shift will increase supply and reduce prices in those markets outside NYISO—meaning that NYPSC's action will have market-distorting ripple effects that reach well beyond New York's borders.

88.     Moreover, the Order's price-suppression effect in NYISO's own capacity market qualifies as an interstate burden because the NYISO wholesale capacity market is an interstate market.

89.     These significant burdens on interstate and international commerce clearly outweigh any supposed local benefits.  Indeed, the purported local benefits are nonexistent or illusory.

90.     *First*, any short-term benefit to New York retail ratepayers from implementation of the agreement embodied in the Term Sheet, in the form of artificial suppression of wholesale capacity prices that are passed on by local utilities to retail ratepayers, is far outweighed by the long-term costs that the agreement will impose on those same ratepayers.  Artificially suppressed prices will ultimately lead to reduced supply and higher prices.

91.     *Second*, although Dunkirk and National Grid estimated that repowering the facility would support jobs in and around Dunkirk, and would generate annual property tax revenue, *see* Order 8-9, these highly localized benefits are outweighed by the burdens imposed by the Order upon interstate and international commerce.

92.    *Third*, any needed improvements in the system to ensure reliability could be obtained through transmission upgrades, which are less costly than repowering Dunkirk and which would not distort the market or burden interstate or international commerce.

93.    Because the asserted benefits to the local and state economies are clearly outweighed by the burdens that the agreement embodied in the Term Sheet would impose on interstate and international commerce, NYPSC's Order is invalid under the dormant Commerce Clause.

94.    Plaintiffs seek a declaration that the NYPSC's Order violates the dormant Commerce Clause.

95.    Plaintiffs further seek a permanent injunction requiring the NYPSC Commissioners to withdraw the Order and/or preventing the NYPSC Commissioners from continuing to treat the Order as valid and binding.

### Prayer For Relief

In light of the foregoing, Plaintiffs respectfully pray that this Court:

A.    Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201, 42 U.S.C. § 1983, and Rule 57 of the Federal Rules of Civil Procedure, that:

 i.    federal law preempts NYPSC's Order, and the Order and Term Sheet are therefore void *ab initio*; and

 ii.    NYPSC's Order violates the dormant Commerce Clause, and the Order and Term Sheet are therefore void *ab initio* for this independent reason;

B.    Issue a permanent injunction, pursuant to 28 U.S.C. §§ 1651(a) and 2202, 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure, requiring the

NYPSC Commissioners to withdraw the Order and/or preventing the NYPSC Commissioners from continuing to treat the Order as valid and binding;

C.      Award reasonable attorneys' fees and costs; and

D.      Award such other relief available under the law that may be considered appropriate under the circumstances, including other fees and costs of this action to the extent allowed by law.

Dated:  February 27, 2015                          Respectfully submitted,


                                    s/ Kathleen M. Sullivan
                                    Kathleen M. Sullivan
                                    Attorney Bar Number:  519248
                                    Attorney for Plaintiffs
                                    QUINN EMANUEL URQUHART
                                       & SULLIVAN, LLP
                                    51 Madison Avenue, 22nd Floor
                                    New York, NY 10010
                                    Telephone:  (212) 849-7000
                                    Fax:  (212) 849-7100
                                    Email:kathleensullivan@quinnemanuel.com

                                    Sanford I. Weisburst
                                    Robert C. Juman
                                    William B. Adams
                                    Ellyde R. Thompson
                                    QUINN EMANUEL URQUHART
                                       & SULLIVAN, LLP
                                    51 Madison Avenue, 22nd Floor
                                    New York, NY 10010
                                    Telephone:  (212) 849-7000
                                    Fax:  (212) 849-7100

                                    Scott A. Barbour
                                    MCNAMEE, LOCHNER, TITUS
                                       & WILLIAMS, P.C.
                                    677 Broadway
                                    Albany, NY 12207
                                    Telephone:  (518) 447-3213

Douglas Green
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone:  (202) 429-3000

Gregory W. Camet
Karis Anne Gong Parnham
ENTERGY SERVICES, INC.
101 Constitution Ave., NW, Suite 200 East
Washington, DC 20001
Telephone:  (202) 530-7322

William B. Glew, Jr.
ENTERGY SERVICES, INC.
440 Hamilton Avenue
White Plains, NY 10601
Telephone:  (914) 272-3360

Wendy Hickok Robinson
ENTERGY SERVICES, INC.
639 Loyola Avenue, Suite 2600
New Orleans, LA 70113
Telephone:  (504) 576-5437

*Attorneys for Plaintiffs*