UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ENTERGY NUCLEAR FITZPATRICK, LLC,
ENTERGY NUCLEAR POWER
MARKETING, LLC, and ENTERGY
NUCLEAR OPERATIONS, INC.,

                Plaintiffs,

          -v-                                5:15-CV-230

AUDREY ZIBELMAN, in her official capacity
as Chair of the New York Public Service
Commission, PATRICIA L. ACAMPORA, in
her official capacity as Commissioner of the
New York State Public Service Commission,
DIANE X. BURMAN, in her official capacity
as Commissioner of the New York Public
Service Commission, and GREGG C. SAYRE,
in his official capacity as Commissioner of the
New York State Public Service Commission,

                Defendants,

          -and-

DUNKIRK POWER, LLC,

                Intervenor-Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                      OF COUNSEL:

QUINN, EMANUEL LAW FIRM        SANFORD I. WEISBURST, ESQ.
Attorneys for Plaintiffs               ELLYDE R. THOMPSON, ESQ.
51 Madison Avenue, 22nd Floor     KATHLEEN M. SULLIVAN, ESQ.
New York, NY 10010             ROBERT C. JUMAN, ESQ.
                                   WILLIAM B. ADAMS, ESQ.
                                   YELENA KONANOVA, ESQ.

ENTERGY SERVICES, INC.                          GREGORY W. CAMET, ESQ.
Attorneys for Plaintiffs                        KARIS ANNE G. PARNHAM, ESQ.
101 Constitution Avenue NW, Suite 200 East
Washington, DC 20001

639 Loyola Avenue, 26th Floor                   WENDY HICKOK ROBINSON, ESQ.
New Orleans, LA 70113

440 Hamilton Avenue, 12th Floor                 WILLIAM B. GLEW, JR., ESQ.
White Plains, NY 10601

MCNAMEE, LOCHNER LAW FIRM                        SCOTT A. BARBOUR, ESQ.
Attorneys for Plaintiffs
677 Broadway
Albany, NY 12207

STEPTOE, JOHNSON LAW FIRM                        DOUGLAS G. GREEN, ESQ.
Attorneys for Plaintiffs
1330 Connecticut Avenue NW
Washington, DC 20036

SPIEGEL & MCDIARMID LLP                          JEFFREY A. SCHWARZ, ESQ.
Attorneys for Defendants
1875 Eye Street NW, Suite 700
Washington, DC 20006

NEW YORK STATE DEPARTMENT                        JOHN C. GRAHAM, ESQ.
    OF PUBLIC SERVICE                            PETER J. HOPKINS, ESQ.
Attorneys for Defendants                         SCOTT H. STRAUSS, ESQ.
Three Empire State Plaza
Albany, NY 12223

PUBLIC SERVICE COMMISSION OF THE                 JONATHAN D. FEINBERG, ESQ.
    STATE OF NEW YORK
Attorneys for Defendants
Three Empire State Plaza, 18th Floor
Albany, NY 12223

NEW YORK STATE PUBLIC                            LINDSEY N. OVERTON, ESQ.
    SERVICE COMMISSION                           SALOMON T. MENYENG, ESQ.
Attorneys for Defendants
Three Empire State Plaza, 17th Floor
Albany, NY 12223

BARCLAY DAMON LLP                              YVONNE E. HENNESSEY, ESQ.
Attorneys for Intervenor-Defendant             EKIN SENLET, ESQ.
80 State Street
Albany, NY 12207

NRG ENERGY, INC.                               ABRAHAM H. SILVERMAN, ESQ.
Attorneys for Intervenor-Defendant
211 Carnegie Center
Princeton, NJ 08540

DAVID N. HURD
United States District Judge

## <u>MEMORANDUM–DECISION and ORDER</u>

## I. <u>INTRODUCTION</u>

Plaintiffs Entergy Nuclear Fitzpatrick, LLC, Entergy Nuclear Power Marketing, LLC, and Entergy Nuclear Operations, Inc. (collectively "Entergy" or "plaintiffs") seek to invalidate a June 13, 2014 Order (the "Order") issued by defendant Commissioners of the New York Public Service Commission ("NYPSC") (collectively the "Commission"), sued here in their respective official capacities.

The challenged Order approves a subsidy-like agreement between non-party National Grid, a retail utility company, and intervenor-defendant Dunkirk Power, LLC ("Dunkirk"), a generating facility that had previously announced plans to shut down due to unprofitability, that would keep Dunkirk in business for at least another decade.

According to Entergy, this agreement will improperly suppress market prices for the sale of wholesale electric energy, causing economic harm to other generating facilities participating in the relevant regional market (such as plaintiffs, as owners and operators of a nuclear power plant based in Oswego, New York). Plaintiffs assert two claims for relief from this alleged harm: Count One seeks a declaration that the Commission's Order is both

field- and conflict-preempted by the Federal Power Act ("FPA"), which confers exclusive regulatory jurisdiction over the marketplace for wholesale electric energy on the Federal Energy Regulatory Commission ("FERC"); alternatively, Count Two seeks a declaration that the Commission's Order violates the dormant Commerce Clause.

The Commission has moved pursuant to Federal Rule of Civil Procedure ("Rule") 12(c) seeking a judgment on the pleadings or, in the alternative, partial dismissal of Count One pursuant to the doctrine of primary jurisdiction. The motion has been fully briefed and oral argument was heard on October 16, 2015 in Utica, New York.[1] Decision was reserved.

## II. BACKGROUND[2]

For much of the 20th century, local utility companies dominated the burgeoning market for electrical energy, exercising exclusive control over the production, transmission, and delivery of electrical power to their end-user customers. Am. Compl. ¶ 31. These purely intrastate entities were subject only to state and local regulation without interference from the federal government. See id.

However, rapid technological advancements eventually made it possible for some of these companies to begin selling their electrical power to buyers located in neighboring states. Am. Compl. ¶ 32. These interstate sales raised the question of (and generated

---

[1] Dunkirk participated in oral argument on this motion. However, it did not initially file its own motion to dismiss, nor did it seek leave to join in the briefing of the Commission's motion. Instead, Dunkirk filed a separate memorandum of law, ostensibly "in support" of the Commission's already-filed motion, on the very same day plaintiffs' response to that motion was due. As plaintiffs were quick to point out, this course of action worked to deprive them of an opportunity to respond to certain arguments made in Dunkirk's filing, which advanced at least one additional basis for dismissal. Therefore, out of basic fairness, and over Dunkirk's unwarranted objection, plaintiffs were permitted to submit a brief "rejoinder" to Dunkirk's arguments.

[2] The following factual allegations, drawn from Entergy's Amended Complaint, are assumed true for purposes of this motion.

lawsuits over) whether state and local authorities could properly regulate these new, cross-border transactions without running afoul of the dormant Commerce Clause.  See id.

In 1927, the Supreme Court answered that question in the negative, holding in Public Util. Comm'n of R.I. v. Attleboro Steam & Elec. Co., 273 U.S. 83, 89-90 (1927), that the states were in fact barred from regulating certain electricity transactions, such as the wholesale sales at issue here, that crossed state lines.  Am. Compl. ¶ 32.  That ruling created the so-called "Attleboro gap," a regulatory vacuum only Congress could fill.  Id.

In 1935, Congress took up the mantle by enacting the FPA, which initially vested FERC's predecessor with broad authority to regulate the transmission and sale of wholesale electric energy in interstate commerce.  Am. Compl. ¶ 33.  Under this regulatory regime, traditional state authorities, such as NYPSC, retained jurisdiction over the entities, such as National Grid, responsible for intrastate retail sales of power to customers.  Id. ¶ 35.

Since 1935, FERC's role in the electrical energy business has grown exponentially as the market has shifted away from local utility monopolies toward a competitive, nationwide "grid" system of electrical distribution.[3]  Am. Compl. ¶ 34.  Among other things, the FPA empowers FERC to regulate this massive interstate wholesale market to ensure that nationwide electricity rates are "just and reasonable."  Id. ¶ 36.

However, FERC prefers not to engage in the direct setting of these energy rates.  Am. Compl. ¶ 37.  Instead, it has pursued its mandate indirectly:  first, by encouraging the creation of regional non-profit entities, known as "regional transmission organizations" or "independent system operators," charged with administering and maintaining portions of the

---

[3]  The vast majority of electricity transported within the continental United States flows across one of two such grids, known as the Eastern and Western Interconnects.  Am. Compl. ¶ 34.  Texas maintains a third, largely separate power grid of its own.  Id. n. 8.

nationwide electrical grid; second, and more importantly, by exercising a measure of control over the competitive auctions for wholesale pricing that these regional operators conduct. Id. ¶ 38.

The relevant FERC-approved regional organization in this case is the New York Independent System Operator, Inc. ("NYISO").[4] Am. Compl. ¶ 38. NYISO operates two different wholesale markets in New York: the "energy market" and the "capacity market." Id. ¶ 39. In the "energy market," generators sell actual electric energy to retailers. Id. In the "capacity market," however, generators sell retailers the option to purchase electricity in the future. Id. The capacity market acts as a tool that a regional entity like NYISO can use (subject to FERC's oversight) to help ensure a reliable and adequate supply of electric power to the region's customers. See id.

NYISO operates its capacity market by conducting monthly "spot market auctions" in four sub-zones within the region. Am. Compl. ¶ 41. In these mandatory auctions, NYISO first issues a determination: it announces the aggregate amount of electrical power it has predicted will be needed by all electricity consumers in a particular area during the coming month. Id. The electrical generators that sell capacity to consumers in this region must then respond by submitting a monthly "bid": an offer to sell a certain amount of future electrical capacity at a certain price. Id. ¶ 42.

NYISO "stacks" this list of bids from the lowest to highest price. Am. Compl. ¶ 42. Then, starting with the lowest price offering, NYISO "accepts" each bid in increasing order

---

[4] Although many of these regional organizations have authority over areas whose boundaries cross state lines, New York is somewhat unique in that it has its own entity exclusively for the state. Central Hudson Gas & Elec. Corp. v. F.E.R.C., 783 F.3d 92, 98 (2d Cir. 2015). And while many of the generators who participate in the NYISO's auctions are located within New York, some are located outside the state. Am. Compl. ¶ 2.

until the total predicted demand—the aggregate amount of electricity NYISO believes will be needed for consumers in the coming month—has been met. Id. The last (and highest) bid price that NYISO accepts during this process establishes what is known as the "market-clearing price." Id.

In industry parlance, any electrical generator that bids at or below this "market-clearing price" is referred to as having "cleared" the market. Am. Compl. ¶ 42. A generator who "clears" the market is rewarded by being paid the "market-clearing price" and, in exchange for this payment from NYISO, the power generator is on the hook to deliver the amount of electric energy it had represented it would be able to provide when it submitted its bid. Id. Conversely, the electrical generators who bid above the "market-clearing price" are not selected, receive no payments, and have no future obligation to provide any energy in the capacity market. Id.

In other words, this "stacking" system incentivizes power generators to operate in a cost-effective manner, since generators that bid too high will not "clear the market" and therefore will not make money in the region. Am. Compl. ¶ 44. Importantly, it also provides pricing signals to other generators who may be considering entering the regional market (because they can produce power at or below the "market-clearing price" and thus sell their energy) or considering exiting the power delivery business in that region (because, for example, operating costs have become too high to remain competitive there). Id.

In March 2012, Dunkirk, a coal-fired power plant located in Western New York that participates in NYISO's wholesale capacity market, concluded that it could no longer bid at a competitive rate and would not be profitable going forward. Am. Compl. ¶¶ 3, 50. Accordingly, it announced plans to shut down, or "mothball" its facility, "due to presently

unfavorable economic conditions." Id. This announcement set off a major crisis in Chautauqua County, since Dunkirk was not only the area's largest employer, but also by far the County's largest taxpayer. See generally Am. Compl. Dunkirk also notified the Commission of its intent to cease operations since, as noted above, NYPSC has retained its traditional authority over various aspects of the intrastate retail sale of power.[5]

The Commission reviewed the situation and concluded that a Dunkirk shutdown raised the possibility that the *reliability* of electric service in the Western New York area could be negatively impacted. Am. Compl. ¶ 50. Accordingly, NYPSC directed National Grid—the local retail utility that purchases power on the wholesale market and resells it to homeowners and businesses in the Western New York area—to investigate whether a Dunkirk shutdown would actually cause any reliability problems and, if so, how best to address those problems. Id. ¶ 51. The Commission also directed National Grid to explore whether Dunkirk should be kept in operation as a means of ensuring reliability over the next decade. Id.

The upshot of National Grid's eventual response to these directives was that it had considered a number of scenarios and believed that keeping Dunkirk in business would be far less cost-effective than simply undertaking transmission line upgrades on other aspects of the local power grid. Am. Compl. ¶¶ 52-54. In fact, National Grid believed these infrastructure upgrades would ultimately be necessary regardless of whether Dunkirk was somehow kept operational. Id.

Nevertheless, in late 2013, Governor Cuomo made a surprise announcement that Dunkirk would be saved—the facility's owner, NRG Energy, Inc., had reached an agreement

---

[5] Among other things, NYPSC's mission is to "ensure affordable, safe, secure, and *reliable* access to electric . . . services for New York State's residential and business consumers." See http://www.dps.ny.gov/ (last visited February 25, 2016).

with National Grid to keep Dunkirk operational by partially subsidizing the facility's planned conversion from coal to natural gas to the tune of over $20 million a year for the next decade.[6]  Am. Compl. ¶¶ 4, 55.  In exchange, Dunkirk agreed to pay a portion of its future revenues back to National Grid under certain circumstances.  Id. ¶ 8.

This agreement, referred to by the parties as the "Term Sheet," required final approval by NYPSC.  Am. Compl. ¶¶ 56, 61.  The Commission approved the Term Sheet on June 13, 2014 over the objections of Entergy, various competing power generators, and a number of public-interest groups.  See generally Am. Compl.; see also Weisburst Decl. Ex. A, ECF No. 58-2.  Although Entergy did not request a rehearing on the Commission's June 13 Order, Earthjustice and the Sierra Club, two of the public-interest groups who objected to the Commission's initial determination, did so on July 14, 2014.  See id.

On July 25, 2014, the Commission issued a "Notice Concerning Petition for Rehearing" indicating NYPSC would conduct a "rehearing evaluation."  Weisburst Decl. Ex. A, ECF No. 58-2.  However, on October 27, 2014, the Commission denied the petition for rehearing.  Am. Compl. ¶¶ 61-62.

## III.  **DISCUSSION**

According to Entergy, the Term Sheet's provisions amount to out-of-market subsidies that throw a wrench in the finely wrought, FERC-approved system of bidding for a "market-clearing price" in the NYISO capacity market, since a power generator that receives subsidy payments to cover all or part of its generating costs, like Dunkirk, is able to bid *below* its actual "going-forward costs over the long term."  Am. Compl. ¶ 46.  As a result, competing

---

[6]  New York State also kicked in a one-time payment of $15 million.  Am. Compl. ¶ 56.

power generators (like Entergy) will suffer ongoing pecuniary harm—each month, Dunkirk's below-cost bids will improperly suppress the "market-clearing prices" below what they would have been absent those subsidies.  Id.  Equally troublesome, this bidding advantage will interfere with the price signaling function performed by the spot market auctions, supplanting the ordinary market dynamics on which the auction participants rely.  Id. ¶ 67.

And while Entergy recognizes that the Commission has some degree of latitude in exercising its traditional state authority of ensuring the reliable functioning of the state power grid, plaintiffs contend that this authority does not give NYPSC license to tamper with areas exclusively reserved to FERC or to use overly broad remedial measures that harm FERC's goal of employing market processes to ensure just and reasonable rates for the wholesale sale of energy.

The Commission has moved pursuant to Rule 12(c), which provides that "[a]fter the pleadings are closed-but early enough not to delay trial-a party may move for judgment on the pleadings."  FED. R. CIV. P. 12(c).  "On a [Rule] 12(c) motion, the court considers 'the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case.'"  L-7 Designs, Inc. v. Old Navy, 647 F.3d 419, 422 (2d Cir. 2011) (quoting Roberts v. Babkiewicz, 582 F.3d 418, 419 (2d Cir. 2009)).  "A complaint is [also] deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not

incorporated by reference, are 'integral' to the complaint." Id. (quoting Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004).[7]

"The standard for granting a [Rule 12(c)] motion . . . is 'identical' to that of a 12(b)(6) motion to dismiss." Ginsburg v. City of Ithaca, 839 F. Supp. 2d 537, 540 (N.D.N.Y.2012) (quoting Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir.2001)). "To survive a Rule 12(b)(6) motion to dismiss, the '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" Id. at 540 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, dismissal is appropriate only if, construing the complaint liberally and drawing all reasonable inferences in the plaintiff's favor, the factual content does not allow for a reasonable inference that the defendant is liable for the misconduct alleged. Id.

Specifically, the Commission has moved for total or partial dismissal of Entergy's operative complaint based on untimeliness, a lack of prudential standing, and the doctrine of primary jurisdiction. Each argument will be addressed in turn.

### A. Timeliness

First, the Commission contends Count One of Entergy's operative complaint, which advances theories of field- and conflict-preemption, is subject to a four-month statute of limitations and therefore, as the complaint was filed eight months after NYPSC's issuance of the June 13, 2014 Order, it must be dismissed as untimely.

---

[7] Importantly, however, even where the document is clearly considered integral, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

Entergy responds by arguing that the NYPSC issued a "Notice Concerning Petition for Rehearing" that tolled the applicable limitations period; alternatively, Entergy asserts a six-year statute of limitations applies to this claim.

The Commission acknowledges the tolling language outlined in its own rehearing notice, but maintains that Entergy cannot take advantage of it because (1) plaintiffs did not participate in that rehearing petition and (2) the rehearing petition concerned different issues than those challenged by plaintiffs here.

On July 25, 2014, subsequent to the issuance of its prior Order approving the Term Sheet, NYPSC issued a "Notice Concerning Petition for Rehearing" in response to a request for rehearing filed by Earthjustice and the Sierra Club. This Notice indicated that:

> The statute of limitations controlling the time to seek review . . . should ordinarily be tolled by a timely petition for rehearing. The four-month period in which to seek review under CPLR § 217 would not therefore commence until issuance of a Commission decision on rehearing . . . . Upon conducting its rehearing evaluation, the Commission may reaffirm its initial decision or adhere to it with additional rationale, modify the decision, reverse the decision, or take such other or further action as it deems necessary.

Weisburst Decl. Ex. A, ECF No. 58-2 (internal citation omitted). In spite of this seemingly unqualified language, the Commission argues that this Notice did not actually toll the four-month statute of limitations as to Entergy, but only as to Earthjustice and the Sierra Club; i.e., those parties who formally petitioned for rehearing.

Assuming, as the Commission urges, that the appropriate limitations period here is four months, "[t]he more difficult question is when the statute of limitations began to run." Walton v. N.Y.S. Dept. of Corr. Servs., 8 N.Y. 3d 186, 194 (N.Y. 2007). Importantly for present purposes, the four-month clock does not begin to run on a challenge to such an

administrative determination until it becomes "final and binding" upon the would-be petitioner.  N.Y.C.P.L.R. § 217.

According to the New York Court of Appeals, this finality attaches when (1) the agency has reached a definitive position on the issue that inflicts actual, concrete injury; and (2) the injury inflicted may not be "significantly ameliorated by further administrative action or by steps available to the complaining party."  Walton, 8 N.Y. 3d at 194-95 (citations omitted).

Here, the Commission may be correct to claim that the June 13, 2014 Order inflicted an actual, concrete injury on Entergy.  However, the plain language of the Commission's own Notice broadly indicates that NYPSC retained the discretion to modify, reverse, or take any other action it deemed appropriate with respect to its original Order, without any indication that such discretion would be limited to the parties who moved for rehearing or even to the specific issues raised by those parties.  In other words, a fair reading of the Notice indicates that the injury plaintiffs claim from the June 13, 2014 Order could still have been "significantly ameliorated by further administrative action"; that is, modification or even reversal of the June 13, 2014 Order.

In their reply memorandum, the Commission claims that the very purpose of issuing a public notice concerning rehearing, such as the one at the center of the dispute here, is to assure only the parties seeking rehearing that the general New York rule against tolling in such instances is inapplicable.  According to the Commission, this practice serves to discourage rehearing petitioners from filing "protective" Article 78 proceedings during the pendency of their rehearing petition.

But if anything, accepting that assertion would require the reader to infer limited purpose, scope, and meaning from the broad, straightforward, and plain language contained

in the Notice itself.  And while a retrospective assessment of the Commission's rehearing decision may indicate the Commission chose to confine its renewed analysis of the issues at play to only those directly concerning Earthjustice or the Sierra Club, no such limitation was stated, or even fairly inferred, in the July 25, 2014 Notice informing the public that the four-month limitations period would not begin to run "until issuance of a Commission decision on rehearing."  Indeed, the unnecessary ambiguity such approaches would create are more likely to in fact encourage more, not fewer, "protective" filings, since interested parties to such administrative proceedings would quickly learn to become distrustful of the broad, unqualified language contained in a Notice that actually requires stakeholders to divine the Commission's institutional mind.

In sum, because the Notice indicated the Commission could reaffirm, modify, reverse, or take any other action NYPSC deemed necessary with respect to the June 13, 2014 Order of which Entergy complains, further administrative action, such as reversal or modification of the Order, might reasonably have "significantly ameliorated" Entergy's injury.  Therefore, this Notice tolled the applicable limitations period for <u>all</u> parties, not just those who sought rehearing.  Accordingly, the Commission's timeliness argument will be rejected.

### B.  Prudential Standing

Next, the Commission contends Entergy lacks prudential standing to assert the dormant Commerce Clause challenge it brings in Count Two because plaintiffs are not actually engaged in any energy capacity sales that cross state borders.

The dormant Commerce Clause, long inferred from the text of U.S. Const. art. I, § 8, cl. 3, is a doctrine that "restrict[s] permissible state regulation." <u>Janes v. Triborough Bridge & Tunnel Auth.</u>, 977 F. Supp. 2d 320, 336 (S.D.N.Y. 2013) (quoting <u>Entergy Nuclear</u>

Vermont Yankee, LLC v. Shumlin, 733 F.3d 393, 429 (2d Cir. 2013)).  The doctrine's primary concern is with economic protectionism—that is, regulatory measures designed to benefit in-state economic interests at the expense of out-of-state competition.  See id.  Accordingly, the doctrine "prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace."  Id. (citation and internal quotation marks omitted).

More importantly for present purposes, the doctrine of prudential standing embodies "judicially self-imposed limits on the exercise of federal jurisdiction."  Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 91 (2d Cir. 2009) (quoting Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004)).  Generally speaking, this doctrine encompasses "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievance more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."  Id

According to the Commission, because a dormant Commerce Clause claim must be premised on differential treatment of in-state and out-of-state economic interests, it "logically follows" that a plaintiff must be an out-of-state participant in order to press such a claim.  Therefore Entergy, as a purely in-state market participant, is an improper party to bring this action.

Entergy responds that, where a state law or regulation violates the dormant Commerce Clause, *any* participant in the affected interstate market has prudential standing to sue, regardless of whether that plaintiff actually alleges harm to any of their own out-of-state transactions.

Initially, it bears noting that the Supreme Court's general view of the Commerce Clause's purpose is to "protect[ ] the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." Exxon Corp. v. Governor of Md., 437 U.S. 117, 127-28 (1978). Consistent with that view, the Court has held that "cognizable injury from unconstitutional discrimination against interstate commerce does not stop at members of the class against whom a State ultimately discriminates." Gen. Motors Corp. v. Tracy, 519 U.S. 278, 286 (1997). In other words, "[i]n conducting the discrimination inquiry, a court should focus on discrimination against *interstate commerce*—not merely discrimination against the specific parties before it." Colon Health Ctrs. of Am., LLC v. Hazel, 733 F.3d 535, 543 (4th Cir. 2013) (citing Exxon Corp., 437 U.S. at 127).

But ultimately, the discrimination inquiry is one for the merits. Here, Entergy correctly argues that the test for prudential standing is "not a rigorous one," and simply requires that "the interest sought to be protected by [plaintiffs] is *arguably* within the zone of interests to be protected or regulated by the . . . constitutional guarantee in question." Selevan, 584 F.3d at 91 (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970)).

For example, one district court in our Circuit that has had occasion to interpret the Second Circuit's reasoning in Selevan focused on the threshold nature of the prudential standing inquiry, noting a plaintiff satisfies the "zone-of-interests" limitation by sufficiently alleging that the [challenged state action] affected interstate commerce." Janes, 977 F.3d at 330 (emphasis added)." As here, the Court in Janes emphasized that the question of whether the challenged state action *actually* improperly burdens interstate commerce is properly resolved at trial. Id.

- 16 -

There is no doubt that Entergy's Amended Complaint sufficiently alleges the Commission's Order unfairly burdens interstate commerce.  In particular, plaintiffs claim that the Commission's June 13, 2014 Order approving the Term Sheet is a state action that benefits an in-state participant (Dunkirk) at the alleged expense of *both* in-state competitors (such as Entergy) and out-of-state competitors.  At the very least, then, the challenged state action is a clear gain to Dunkirk, an in-state entity, at the expense of its competitors in an interstate market.  <u>See</u> Am. Compl. ¶ 2 (noting that although many of the generators who participate in the NYISO's auctions are located within New York, some are located outside the state).

Viewing these facts in light of Entergy's allegations regarding the nationwide nature of the "grid," the reliance by in- and out-of-state market participants on the price signaling function performed by spot market auctions, and the harm to those market participants flowing from the state's preferential treatment of Dunkirk, plaintiffs have sufficiently alleged harm from state action to an interstate market to satisfy the low threshold requirement imposed by prudential standing at this early juncture.  Accordingly, the Commission's second argument will be rejected.

### C. <u>Doctrine of Primary Jurisdiction</u>

Lastly, the Commission contends that the portion of Count One that asserts a "conflict preemption" theory of relief should be dismissed and referred to FERC pursuant to the doctrine of primary jurisdiction.  In support of that position, the Commission notes there is already a FERC proceeding pending on these issues.  Entergy responds that the pending administrative proceeding raises different legal issues and seeks remedies that are distinct from those available in this lawsuit.

The doctrine of primary jurisdiction is "neither jurisdictional nor primary" in nature. MFS Sec. Corp. v. N.Y. Stock Exch., 277 F. 3d 613, 621-22 (2d Cir. 2002). Rather, the doctrine seeks to promote "proper relationships between the courts and administrative agencies charged with particular regulatory duties." United States v. W. Pac. R.R. Co., 352 U.S. 59, 63 (1956)).

To that end, the doctrine aims "to allocate initial decisionmaking responsibility between courts and agencies and to ensure that they 'do not work at cross-purposes.'" Ellis v. Tribune Television Co., 443 F.3d 71, 81 (2d Cir. 2006) (quoting Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp., 84 F.3d 91, 97 (2d Cir. 1996)).

Accordingly, "[r]ecourse to the doctrine of primary jurisdiction is thus appropriate 'whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." Ellis, 443 F.3d at 81 (quoting W. Pac. R.R. Co., 352 U.S. at 64) (footnote omitted).

Understandably, the doctrine is a discretionary one and therefore "no fixed formula exists" to aid in determining its proper application. N.Y. State Thruway Auth. v. Level 3 Commc'ns., LLC, 734 F. Supp. 2d 257, 262 (N.D.N.Y. 2010) (Treece, M.J.). Instead, courts generally consider four factors when deciding whether to defer to an agency's expertise: "(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made[.]" Id. Importantly, the doctrine has a "relatively

narrow scope" and, consequently, cases in which its application is warranted "tend to be the exception and not the norm."  Id.

Here, the Commission argues that the ongoing FERC proceeding, in which one of the plaintiffs in this case is an active participant, deals with, and will resolve, the issue of whether the Term Sheet improperly suppresses prices in the NYISO capacity market.

Entergy responds that this lawsuit and the FERC proceeding are not the same, because FERC's analysis in that proceeding will be limited in an important respect—FERC must assume the lawfulness of the Commission's Order approving the Term Sheet.

Consequently, its proceedings will merely determine whether certain market rules over which FERC exercises control should be adjusted in the NYISO capacity market to *mitigate* the effects of keeping subsidized generators like Dunkirk in service.  By way of contrast, Entergy argues that success in this lawsuit would enable them to enjoin the Commission from enforcing the Order approving the Term Sheet in the first place, thereby invalidating the state action at its source.

After careful consideration, application of the doctrine of primary jurisdiction would be inappropriate here.  As to the first factor, the Commission is correct to note that the factual background present in this case, which involves "fairly technical" issues of energy market organization, are indisputably areas within FERC's expertise.  But those technical background issues are unrelated to the *actual* legal question presented by Entergy's claim; that is, whether the state action challenged here impermissibly conflicts with one or more of FERC's objectives.

Entergy's opposition on this point—that the pending FERC proceeding and this federal lawsuit seek different remedies and therefore this lawsuit should proceed—is strengthened

by a recent Fourth Circuit decision invalidating a similar state subsidy scheme. In that case, the panel rejected the assertion that FERC's decision in a similar proceeding to ultimately accommodate the participation of certain state-subsidized plants in the regional auction resolved any injury to other generators by noting that "[t]he fact that FERC was forced to mitigate [the state order's] distorting effects using [a mitigation remedy], however, <u>tends to confirm rather than refute the existence of a conflict</u>." <u>PPL EnergyPlus, LLC v. Nazarian</u>, 753 F.3d 467, 479 (4th Cir. 2014) (emphasis added) (addressing the type of conflict preemption claim made by plaintiffs here), <u>cert. granted by</u> <u>Hughes v. PPL EnergyPlus, LLC</u>, 136 S. Ct. 382 (Oct. 19, 2015) (Mem.).

As to the second and third factors, FERC's proceeding can only determine whether some form of mitigation ruling would be warranted for the NYISO market; a federal agency proceeding cannot reach the underlying validity of the state-issued Order's propriety, the question at issue in this case. Accordingly, the danger of inconsistent rulings is also unlikely to be realized. <u>Cf</u>. <u>Mical Commc'ns., Inc. v. Sprint Telemedia, Inc.</u>, 1 F.3d 1031, 1033 (10th Cir. 1993) (finding application of primary jurisdiction doctrine warranted where the "precise issue" in the case was pending before the administrative body and therefore there existed a "real possibility that a decision by this court prior to the [agency's] response . . . would result in conflicting decisions").

As to the fourth factor, there is no meaningful inference to be drawn either way, since, as described in detail above, the already-filed agency application to FERC seeks to resolve different issues. Accordingly, this argument will be rejected.

### D. **Dunkirk's Filing**

Finally, Entergy correctly notes that Dunkirk's memorandum in support of NYPSC's motion largely repeats the same arguments already advanced by defendants themselves and those arguments are rejected for substantially the same reasons outlined above.

However, Entergy correctly notes that Dunkirk's memorandum does urge one additional argument:  that Count Two, plaintiffs' dormant Commerce Clause challenge brought pursuant to 42 U.S.C. § 1983, is also untimely.  Dunkirk argues that this claim should be subject to the four-month statute of limitations applicable to Article 78 petitions in New York.

Dunkirk is incorrect.  The Supreme Court has recognized the kind of "chaos and uncertainty" inherent in determining which of various state statutes of limitations should be borrowed and has consequently held that "courts considering § 1983 claims should borrow the general or residual statute for personal injury actions."  Owens v. Okure, 488 U.S. 235, 243, 250 (1989).  In New York, it is well-settled that this limitations period is three years.  See, e.g., Curto v. Edmundson, 392 F.3d 502, 504 (2d Cir. 2004).

The New York state cases cited by Dunkirk provide no indication why Entergy's claim, brought in federal court to vindicate an alleged violation of a federal right, should be somehow excepted from this rule.  See, e.g., McBurney v. Young, 133 S. Ct. 1709, 1714 (2013) ("Petitioners filed suit under 42 U.S.C. § 1983, seeking . . . relief for violations of . . . the dormant Commerce Clause."); Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury, 445 F.3d 136, 149 (2d Cir. 2006) (Sotomayor, J.) (concluding that a district court's grant of prospective injunctive relief "did not render consideration of [plaintiff's] dormant Commerce Clause claim under § 1983 unnecessary" and remanding to the district court to consider that

claim for damages in the first instance).  Accordingly, Dunkirk's additional arguments will be rejected.

## IV.  **CONCLUSION**

"FERC rules encourage the construction of new plants and sustain existing ones.  They seek to preclude state distortion of wholesale prices while preserving general state authority over generation sources.  They satisfy short-term demand and ensure sufficient long-terms supply.  In short, the federal scheme is carefully calibrated to protect a host of competing interests.  It represents a comprehensive program of regulation that is quite sensitive to external tampering."  <u>Nazarian</u>, 753 F.3d at 473.

Here, Entergy has timely asserted claims of harm flowing from state action to an interstate market in which it participates to pass the less-than-rigorous test imposed by prudential standing.  And while it may seem facially appealing to refer certain of plaintiffs' claims to FERC given the technical nature of the facts presented here, the doctrine of primary jurisdiction is generally applied only in narrow circumstances and, more importantly, FERC's mitigation remedies represent a kind of relief distinct from that promised by a federal court.

Therefore, it is

ORDERED that

1.  The Commission's motion to dismiss (ECF No. 36) is DENIED.

IT IS SO ORDERED.

Dated:  March 7, 2016
       Utica, New York.

_____

United States District Judge
