**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 | FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7170**

WRITER'S INTERNET ADDRESS
sandyweisburst@quinnemanuel.com

May 6, 2016

**VIA CM/ECF**
Hon. Therese Wiley Dancks
U.S. Magistrate Judge
U.S. District Court for the Northern District of New York
100 South Clinton Street
Syracuse, NY 13261

    Re:    *Entergy Nuclear FitzPatrick, LLC v. Zibelman*, No. 15-cv-230

Dear Judge Dancks:

    On behalf of Plaintiffs Entergy Nuclear FitzPatrick, LLC, Entergy Nuclear Power Marketing, LLC, and Entergy Nuclear Operations, Inc. ("Entergy"), we respectfully write, pursuant to this Court's order of April 21, 2016, concerning whether, notwithstanding Judge Hurd's denial of Defendants' Rule 12(c) motion, the discovery stay should remain in effect based on *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016). We also address whether *Hughes* impacts the *scope* of discovery.

    As explained in more detail below, we respectfully submit that the stay should be lifted forthwith and that *Hughes* provides no basis for staying or limiting discovery in this case. Discovery has already been delayed for approximately nine months based on the pendency of a Rule 12(c) motion that Judge Hurd ultimately denied in its entirety. ECF 96. Defendants' suggestion that *Hughes* justifies a further stay is baseless. Not only is there no dispositive motion pending (unlike when the Court granted the earlier discovery stay), but *Hughes* affirmatively *supports* Entergy's Federal Power Act ("FPA") field preemption claim, *see* 136 S. Ct. at 1297. Specifically, *Hughes* held that field preemption was established because the State order at issue "adjust[ed] an interstate wholesale rate." *Id.* The Public Service Commission ("PSC") order ("Order") challenged here similarly adjusts an interstate wholesale rate by requiring, among other things:

> [T]hat Dunkirk share with National Grid a portion of its revenues from sales of capacity on the interstate wholesale market overseen by [the New York Independent System Operator, Inc. ("NYISO")]. . . . Under an illustrative example provided in the Term Sheet, during the first five-year period of the Term Sheet, Dunkirk would be required to pay $12.26 million of its revenues from the NYISO capacity auction to National Grid.

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

ECF 51 ¶ 58 (citing Term Sheet 5-6). In other words, Dunkirk Power will not receive what the federally regulated auction market dictates for its capacity, but instead will receive an amount modified by the PSC's Order (and the underlying Term Sheet the Order approves).

Field preemption aside, *Hughes* explicitly declines to address FPA conflict preemption, 136 S. Ct. at 1299 n.13, or the Dormant Commerce Clause, *id.* at 1297 n.7, and thus furnishes no basis for staying or limiting discovery on those claims by Entergy here.

The remainder of this letter brief summarizes *Hughes* and then explains in more detail why *Hughes* does not support staying or limiting discovery in any way.

1. **A Summary Of *Hughes***

One important aspect of the federally regulated interstate wholesale electricity markets is a "competitive wholesale auctio[n]." *See id.* at 1293. The Federal Energy Regulatory Commission ("FERC") has delegated to certain regional transmission organizations ("RTOs") the task of administering these auctions. *Id.* at 1292. The RTO at issue in *Hughes* was PJM Interconnection ("PJM"), which "oversees the electricity grid in all or parts of 13 mid-Atlantic and Midwestern States and the District of Columbia." *Id.* at 1293. One of PJM's auctions is a "capacity auction." *Id.* As explained by the Supreme Court:

> PJM predicts electricity demand three years ahead of time, and assigns a share of that demand to each participating LSE [*i.e.*, load serving entity, a utility that sells electricity at retail to homeowners and businesses]. Owners of capacity to produce electricity in three years' time bid to sell that capacity [at wholesale to PJM, and ultimately to the LSEs] . . . at proposed rates. PJM accepts bids, beginning with the lowest proposed rate, until it has purchased enough capacity to satisfy projected demand. No matter what rate they listed in their original bids, all accepted capacity sellers receive the highest accepted rate, which is called the 'clearing price.' . . . The capacity auction serves to identify need for new generation: A high clearing price in the capacity auction encourages new generators to enter the market, increasing supply and thereby lowering the clearing price in same-day and next-day auctions three years' hence; a low clearing price discourages new entry and encourages retirement of existing high-cost generators.

*Id.*

*Hughes* arose from Maryland's determination that PJM's auction process, on its own, was failing to encourage the building of new power plants. *Id.* at 1294. Maryland took matters into its own hands, promulgating a "Generation Order" that solicited proposals from companies for a new generator in Maryland (CPV Maryland, LLC ("CPV") was selected), and then required Maryland LSEs to enter into a twenty-year pricing contract called a "contract for differences." *Id.* This "contract for differences" required that:

> If CPV's capacity clears the PJM capacity auction and the clearing price falls below the price guaranteed in the contract for differences, Maryland LSEs pay CPV the difference between the contract price and the clearing price. . . . If CPV's capacity

2

clears the auction and the clearing price exceeds the price guaranteed in the contract for differences, CPV pays the LSEs the difference between the contract price and the clearing price . . . .

*Id.* at 1295.

Generators in competition with CPV filed suit challenging Maryland's Generation Order as preempted under both FPA field preemption and conflict preemption, and as unconstitutional under the Dormant Commerce Clause. *Id.* at 1296 & n.7, 1299 n.13. The Supreme Court issued a holding on only the field preemption claim, affirming the Fourth Circuit's judgment (which had affirmed the district court's post-bench-trial judgment) in favor of the plaintiffs on the ground that Maryland's Generation Order is field preempted because it "requires CPV to participate in the PJM capacity auction, but guarantees CPV a rate distinct from the clearing price for its interstate sales of capacity to PJM." *Id.* at 1297–99.

### 2. *Hughes* Does Not Justify A Further Stay of Discovery

*Hughes* provides no basis for a further stay of discovery in this case.

*First*, no dispositive motion is pending, unlike when this Court initially granted the stay on August 14, 2015. A stay is not always warranted "even where a potentially dispositive motion is pending." *Caiola v. Berkshire Med. Ctr., Inc.*, No. 04-CV-623 (FJS/DRH), 2004 WL 2607805, at *5 (N.D.N.Y. Nov. 17, 2004). *A fortiori*, when no such motion is pending, a stay should be denied. Nor can Defendants solve this problem by filing a new dispositive motion. Defendants are barred by Rule 12(g)(2) from filing another Rule 12(c) motion; Rule 12(h)(2) does not permit "*ad nauseam* successive Rule 12(c) motions addressed to the same pleading." *Fisher v. Dallas Cnty.*, No. 12-CV-3604-D, 2014 WL 4797006, at *8 (N.D. Tex. Sept. 26, 2014).[1] To the extent Defendants attempt to file a summary judgment motion now, it would be premature under Rule 56(d). *See Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303–07 (2d Cir. 2003) (reversing a pre-discovery grant of summary judgment because summary judgment should not be "granted against a plaintiff who has not been afforded the opportunity to conduct discovery") (internal quotation marks omitted).

*Second*, and in any event, *Hughes* affects only a portion of one of Entergy's claims—namely, FPA field preemption—and indeed *supports* that claim. Just as *Hughes* found the Maryland scheme field preempted because it "adjust[s] an interstate wholesale rate," 136 S. Ct. at 1297, the PSC's Order is field preempted because it requires, among other things, "that Dunkirk share with National Grid a portion of its revenues from sales of capacity on the interstate wholesale market overseen by NYISO," ECF 51 ¶ 58 (citing Term Sheet 5-6); *see also, e.g.*, *id.* ¶¶ 5–8 (explaining how "the

---

[1] As Judge Hurd recognized (ECF 96 at 4 n.1, 21–22), Dunkirk Power filed its own memorandum of law requesting judgment under Rule 12(c), and participated in oral argument on the motion, repeating the PSC Defendants' arguments, and adding its own, all of which Judge Hurd rejected. Dunkirk Power cannot now file a repeat Rule 12(c) motion.

3

NYPSC's Order supplants the capacity market price that Dunkirk would receive from the FERC-approved market with a different price preferred by the NYPSC").

Defendants may argue that *Hughes* holds that a State order is field preempted only where it "condition[s] payment of funds [to the generator] on capacity clearing the auction." 136 S. Ct. at 1299. But *Hughes* did not impose that as a general requirement, instead stating that "we . . . need not and do not address the permissibility of various other measures" not at issue in *Hughes*. *Id.* Thus, the Court's observation that the "fatal defect" in Maryland's program was its "condition[ing] payment of funds on capacity clearing the auction," *id.*, cannot be construed to imply that a State program lacking these features would pass muster. In any event, the PSC's Order does condition payment of funds to Dunkirk on its capacity clearing an auction. *See* ECF 51 ¶ 56 ("Units bid in compliance with existing NYISO market rules . . . .") (internal quotation marks omitted); *id.* n.22 ("NYISO's rules require a non-retired generator that sells into the energy market on a daily basis (as Dunkirk must, *see* Term Sheet 4) to participate in the capacity auction."); *id.* ("Dunkirk also would have a clear economic incentive to bid in that auction [at an offer of zero, to ensure that its bid is accepted] because the annual $20.41 million payments from National Grid and the additional $15 million subsidy from a New York agency are insufficient to fund the repowering project and the ongoing cost of operating the facility."). At a minimum, this is a factual question on which discovery should be permitted before any conclusion can be reached.

*Third*, even if *Hughes* somehow impacts Entergy's ability to obtain discovery on its field preemption claim, *Hughes* leaves entirely untouched Entergy's conflict preemption and Dormant Commerce Clause claims. As to the conflict preemption claim, while *Hughes* did not address the claim as to Maryland's scheme, *Hughes* did describe the claim as including a theory that Maryland's scheme "interferes with the capacity auction's price signals." 136 S. Ct. at 1299 n.13. Here, Entergy has alleged that the PSC's Order, in keeping the otherwise uneconomic Dunkirk generator on-line (instead of mothballed, as was Dunkirk Power's original plan), will decrease the clearing price in the auction and in turn decrease revenues received by other generators. ECF 51 ¶ 71. "This may cause prospective new generators to forego entry, and may cause existing generators to forego further investment in their facilities. In the long term, the decrease in NYISO-market revenues brought about by the Term Sheet may force some generators to exit the market prematurely." *Id.* As to the Dormant Commerce Clause claim, again not addressed by *Hughes*, *see* 136 S. Ct. at 1296 n.7, Entergy alleges that PSC's Order impermissibly bestows on a single in-state generator millions of dollars in out-of-market subsidy benefits that will harm competing generators in the interstate wholesale capacity market, placing burdens on interstate commerce that vastly exceed the in-state benefits. ECF 51 ¶¶ 89–101. Discovery will enable Entergy to prove these non-field preemption claims.

### 3. *Hughes* Does Not Support Narrowing Discovery

Just as *Hughes* does not justify a further stay of discovery, it does not support any narrowing of discovery. As an initial matter, any discovery disputes should be resolved through the mechanisms provided in the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 26(c), 37(a). But, regardless, each of Entergy's document requests ("RFPs") and interrogatories seeks discoverable information bearing on Entergy's claims under FPA field preemption, FPA conflict preemption, and the Dormant Commerce Clause. We provide some non-exhaustive examples here.

4

*Field preemption*. This claim alleges that the PSC's Order "adjust[s] an interstate wholesale rate," *Hughes*, 136 S. Ct. at 1297. Additionally, although *Hughes* did not discuss evidence of Maryland's specific intent to affect the wholesale capacity market price, *but see id*. at 1298 (citing *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1599 (2015)) (recognizing intent can be relevant), this claim alleges that PSC Commissioners had such intent, ECF 51 ¶ 61 (PSC Order's statement that a goal is "competitiveness of the electric market"). Many of Entergy's RFPs and interrogatories bear on at least one of these issues. For example, RFP No. 41 to PSC Defendants seeks "[a]ll documents concerning any projected revenue sharing between Dunkirk Power and National Grid as contemplated in the Term Sheet . . . ." *See also*, *e.g.*, RFP No. 4 to PSC Defendants and Dunkirk Power (seeking "[a]ll documents concerning any actual or proposed NYISO rule . . . relating to Dunkirk Power or the Dunkirk facility, including, but not limited to the Dunkirk facility's bidding in the NYISO energy and/or capacity markets"); RFP No. 6 to PSC Defendants and Dunkirk Power (seeking "[a]ll documents concerning any plan or strategy concerning prices in the NYISO wholesale capacity markets"); RFP No. 12 to PSC Defendants and Dunkirk Power (seeking documents concerning communications with various entities concerning, *inter alia*, the goal or purpose of repowering Dunkirk); Interrogatory No. 2 to PSC Defendants and to Dunkirk Power (seeking information on attendees at meetings between PSC Staff and Dunkirk Power during which the PSC's goals or purposes may have been discussed).

*Conflict preemption*. This claim asks whether the PSC's Order "interferes with the capacity auction's price signals." *Hughes*, 136 S. Ct. at 1299 n.13. Many of Entergy's RFPs and interrogatories concern that question. *See, e.g.*, RFP No. 2 to PSC Defendants and Dunkirk Power (seeking "[a]ll documents concerning the Dunkirk facility's potential future participation in the NYISO energy and/or capacity markets . . . ."); RFP No. 7 to PSC Defendants and Dunkirk Power (seeking "[a]ll documents concerning past and/or future projected clearing prices in Capacity Zones A-H . . . ."); RFP No. 19 (seeking "[a]ll documents concerning any proposed solution to any problem or issue that may have resulted from the proposed 'mothballing' of the Dunkirk facility . . . that You . . . considered as an alternative to repowering the Dunkirk facility . . . .").

*Dormant Commerce Clause*. This claim alleges that the PSC Order imposes costs on interstate commerce that are disproportionate to any benefits. Discovery is needed on, among other things, the nature of those costs and benefits and what alternatives were considered. *See, e.g.*, RFP No. 19 to PSC Defendants and Dunkirk Power (quoted above); RFP No. 43 to PSC Defendants (seeking documents supporting assertion that PSC's Order was needed to address transmission congestion); RFP No. 46 to Dunkirk Power (similar).

## Conclusion

The discovery stay should be lifted forthwith.

Respectfully submitted,

/s/ Sanford I. Weisburst

Sanford I. Weisburst

cc: Counsel of Record (via CM/ECF)

5